People v White-Span (2020 NY Slip Op 02495)





People v White-Span


2020 NY Slip Op 02495


Decided on April 30, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 30, 2020

107499 109912

[*1]The People of the State of New York, Respondent,
v
Jovell White-Span, Appellant.

Calendar Date: February 14, 2020

Before: Garry, P.J., Egan Jr., Mulvey, Aarons and Colangelo, JJ.


Matthew C. Hug, Albany, for appellant.
P. David Soares, District Attorney, Albany (Emily Schultz of counsel), for appellant.



Colangelo, J.
Appeals (1) from a judgment of the County Court of Albany County (Lynch, J.), rendered January 21, 2015, upon a verdict convicting defendant of the crime of murder in the second degree, and (2) by permission, from an order of said court, entered November 15, 2017, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, after a hearing.
In April 2014, defendant and codefendant Jahmeek Croley were indicted on charges of murder in the second degree and conspiracy in the second degree in connection with a shooting on October 19, 2013 that resulted in the victim's death. Following a joint jury trial, defendant was convicted of murder in the second degree [FN1] and thereafter sentenced to a prison term of 25 years to life. In March 2017, defendant moved pursuant to CPL 440.10 to vacate the judgment of conviction claiming, among other violations, that he was deprived of the effective assistance of counsel. County Court denied the majority of the motion and ordered a hearing only with respect to the ineffective assistance of counsel claim. After the hearing, the court denied the motion in its entirety, finding that defense counsel had offered strategic reasons for his actions. Defendant appeals from the judgment of conviction and, with permission, from the order denying his motion to vacate. We affirm.
Defendant challenges the validity of the indictment, contending that the conviction must be vacated and the indictment dismissed due to prejudicial testimony introduced before the grand jury. Although defendant moved, in his omnibus motion, for dismissal of the indictment on the basis that the evidence before the grand jury was legally insufficient, he failed to move to dismiss the indictment on the specific grounds he now raises. Accordingly, this argument is not preserved for our review (see People v Gunney, 13 AD3d 980, 984 [2004], lv denied 5 NY3d 789 [2005]).
Defendant next contends that the jury verdict finding him guilty of second degree murder was not supported by legally sufficient evidence and was against the weight of the evidence. Initially, as defendant's motion for a trial order of dismissal at the close of the People's case "was not directed at the specific arguments he raises on appeal, [his] legal sufficiency claim is unpreserved" (People v Shackelton, 177 AD3d 1163, 1165 [2019], lv denied 34 NY3d 1162 [2020]; see People v Gray, 86 NY2d 10, 19-20 [1995]; People v Youngs, 175 AD3d 1604, 1606 [2019]). Nevertheless, in reviewing whether "the verdict is against the weight of the evidence, this Court necessarily must ensure that the People proved each element of the crime beyond a reasonable doubt. In conducting such a review, where an acquittal would not have been unreasonable, we view the evidence in a neutral light and, while giving deference to the jury's credibility determinations, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Brinkley, 174 AD3d 1159, 1160-1161 [2019] [internal quotations marks and citations omitted], lv denied 34 NY3d 979 [2019]; see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Hilton, 166 AD3d 1316, 1318 [2018], lv denied 32 NY3d 1205 [2019]). As relevant here, "[a] person is guilty of murder in the second degree when
. . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]). "[T]he intent to kill may be inferred from the surrounding circumstances and a defendant's actions" (People v Reese, 166 AD3d 1057, 1058 [2018] [internal quotation marks and citations omitted], lv denied 33 NY3d 953 [2019]; see People v Conway, 179 AD3d 1218, 1219 [2020]).
Defendant's conviction was based entirely on circumstantial evidence, as no murder weapon was found, there were no eyewitnesses to the shooting and no evidence regarding a motive for the killing was offered by the People. The People's case primarily relied upon video surveillance, testimony from witnesses who were in the area when the shooting occurred, cell phone records and the autopsy report, which established that the victim sustained three gunshot wounds, including a fatal wound to his head.
Christopher Cornell, a detective assigned to investigate this shooting, reviewed the surveillance videos captured from outside of Willie's Sports Bar on Washington Avenue in the City of Albany (hereinafter the bar) and from outside a nearby Stewart's shop. The bar video depicts a person who appears to be the victim entering the bar shortly after 2:00 a.m. and, approximately five minutes later, a person later identified as Croley entered the bar and then exited after only three minutes and walked away. Cornell testified that surveillance video from outside the Stewart's shop depicts Croley pulling his vehicle into the Stewart's parking lot at approximately 2:37 a.m., with a passenger, later identified as defendant. Both Croley and defendant are seen exiting the vehicle, after which defendant immediately pulls his hood up and quickly walks away from the vehicle with Croley following him. Defendant was wearing a blue hooded U.S. Polo sweatshirt, bearing the letters "USA" in gold or yellow with a big pony symbol on the chest, and "very distinct" black and yellow Nike Foamposit sneakers. Cornell explained that he was able to later identify the passenger as defendant through a Facebook photograph showing defendant wearing the exact outfit, including the distinctive sneakers that he was wearing on the morning of the shooting. The video from the bar shows Croley reentering the bar at approximately 2:39 a.m. after being frisked by the bouncer, and Cornell testified that he was able to locate defendant on a surveillance video outside of the bar making "several passes back and forth" without entering the bar. The video shows that defendant was pacing and standing on the sidewalk in front of the bar between approximately 2:42 a.m. and 2:46 a.m. The victim is seen exiting the bar with another person at 3:05 a.m. and, one minute later, defendant is observed walking past the bar following in the same direction as the victim. The shooting occurred at approximately 3:08 a.m.
Timothy Pfeiffenberger, a bouncer at another establishment in the vicinity of the bar, testified that he was standing on the corner of North Lake Avenue and Washington Avenue at approximately 3:15 a.m. or so and heard gunshots. He then went to the corner and "immediately saw [defendant, who he identified at trial,] jogging from the intersection of Cortland [Place] and Washington [Avenue] toward [his] direction, . . . running in front of some traffic, in between some cars." He recounted that defendant "[p]assed directly by [him], about two feet away from [him]" and described him as an "African-American male," with "dreadlocks about four to six inches long, about [5 feet 8 inches, wearing] a blue hoodie . . . with gold USA across the front of it." According to Pfeiffenberger, defendant was "running, had [the] hoody up but it was bouncing on and off. Pulling [his] pants up. Just seemed to be fleeing the scene." Pfeiffenberger could not see if there was anything in defendant's hand.
Huie Courtney testified that, on the morning of the shooting, at approximately 3:00 a.m. as he turned onto Washington Avenue, he heard five gunshots coming from the direction of Cortland Place where, it was later discovered, the victim was shot. After hearing the gunshots, Courtney saw a "short black male with shoulder-length dreads" wearing dark clothing with lettering on his shirt walking toward him from across the street. Courtney testified that this individual, now known as defendant, "[took] his hood off and . . . a skull cap or a do-rag fell off." Courtney described that defendant walked fast, "with his hands in his hoody" and "took off" after turning the corner. According to Courtney, after turning the corner, defendant moved "like he was just trying to get away from the scene." Courtney did not observe that defendant was carrying a gun.
Donald Columbus, a friend of the victim, testified that, in the early morning hours of October 19, 2013, he was with the victim and Donovan Johnson at a party at the YMCA. After leaving the party, they drove in Columbus' white Infinity, parked on Cortland Place and went into the bar. After about 30 minutes, Columbus and the victim left the bar and saw the victim's cousin, Jamil Jordan, on Washington Avenue. The victim started talking to Jordan on the corner, and Columbus went to his car, which was located four or five car lengths from the corner where the victim and Jordan were talking. Upon hearing gunshots, Columbus ran away and, in the process, lost his gold chain, which was subsequently recovered in the vicinity of where his car was parked and the shell casings were recovered. Columbus did not see anyone with a gun, did not see the victim get into a fight with anyone or get shot and, after they left the bar, did not see anyone following them. Columbus testified that after the gunfire ended, he returned to Cortland Place and saw Jordan and Josh Otero putting the victim into Otero's car to go to the hospital. When Otero's car drove away with the victim, Columbus and Jordan walked back to the bar with the intention of getting Johnson to leave so that Columbus and Johnson could go to the hospital. Columbus testified that he went to the hospital the next day. Testimony at trial established that two bullet holes from a projectile went through the passenger side mirror into the front hood of the Infinity, leading to the conclusion that the passenger door of Columbus' Infinity was open when the shots were fired.
Steven Whittingham testified that he was with Jordan at the same YMCA party and, after they left, they walked toward the bar and saw the victim and Columbus. After a brief conversation, Whittingham continued to walk toward the bar and the victim, Jordan and Columbus walked to Columbus' car to smoke marihuana. Whittingham recounted that, while he was still walking, he heard "a few gun shots" coming from behind him and then ran. Jordan corroborated Whittingham's testimony and also recounted that, as he was walking to Columbus' car, he heard shots being fired, ran away and then fell down. When he got up, he walked toward the street where Columbus' car was parked and picked up the victim, who had been shot and was lying in the street. When Otero arrived, they put the victim in Otero's car for transport to the hospital. Jordan testified that Columbus returned to the scene, after which they walked to the bar. Jordan did not see who shot the victim.
Dean Halpin, a detective, testified that, on the morning of the shooting, he went to the vicinity of where the shooting occurred and located, among other things, .40 caliber shell casings and a gold chain. He recounted that a "do-rag" was recovered on Washington Avenue, which was later tested for DNA and found to contain defendant's DNA. Cornell testified that defendant was interviewed in connection with this case and admitted to investigators that he was the person in the Facebook photograph wearing the same outfit as seen on the surveillance videos. Defendant denied knowing Croley and claimed that he did not recognize Croley's vehicle. Defendant's denial was belied by evidence of a series of phone calls made between defendant and Croley before and after the shooting that supported the People's theory that the victim's movements were being monitored by Croley and conveyed to defendant.
We find the verdict to be supported by the weight of the evidence. The surveillance videos support the jury's conclusion that defendant was the shooter. The video from the bar shows that Croley arrived back at the bar and was frisked upon entering at approximately 2:39 a.m., and defendant is seen pacing back and forth in front of the bar but did not enter, presumably to avoid being frisked. A permissible inference to be drawn from the video is that, as the People alleged, defendant was armed with a concealed weapon that would have been discovered had he entered the bar. In addition, defendant is seen following the victim when the victim left the bar. The jury also heard testimony that a "do-rag" with defendant's DNA was found near the scene of the shooting, and two witnesses described observing defendant running from the direction of where the shooting occurred at a pace that indicated he was fleeing the scene. Thus, "upon evaluating the evidence in a neutral light, weighing the probative force of the testimony and considering the relative strength of the inferences to be drawn from the proof, we cannot say that the jury failed to give the evidence the weight it should be accorded" (People v Malloy, 166 AD3d 1302, 1307 [2018] [internal citations omitted], affd 33 NY3d 1078 [2019]; see People v Bleakley, 69 NY2d at 495).
Contrary to defendant's contention, County Court did not err in admitting autopsy photographs of the victim at trial. As a general rule, "photographs of a victim's deceased body . . . are admissible if they tend to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered[,] and should be excluded only if their sole purpose is to arouse the emotions of the jury and to prejudice the defendant" (People v Serrano, 173 AD3d 1484, 1488 [2019] [internal quotation marks and citations omitted], lv denied 31 NY3d 937, 939 [2019]; see People v Molineaux, 156 AD3d 1250, 1252 [2017], lv denied 31 NY3d 1085 [2018]). Given that the photographs depicted the entry and exit wounds to the victim, they were properly admitted for the purposes of showing intent and the cause of death (see People v Greenfield, 167 AD3d 1060, 1063 [2018], lv denied 32 NY3d 1204 [2019]). Moreover, the photographs were not overly gruesome and the court provided a proper limiting instruction to the jury. As the photographs were relevant to material, disputed issues and their sole purpose was not to arouse the jury's emotions or prejudice defendant, the court did not abuse its discretion in admitting the photographs (see id.).
Defendant contends that he was deprived of the effective
assistance of counsel by counsel's failure to "investigate the facts of the case, review the file, prepare for trial, understand criminal procedure, or prepare an appropriate defense." As these contentions raise both record-based and nonrecord-based allegations of ineffectiveness, they will be addressed together in their entirety in the context of defendant's appeal from the denial of his CPL 440.10 motion (see People v Taylor, 156 AD3d 86, 91-92 [2017], lv denied 30 NY3d 1120 [2018]; see also People v Thacker, 173 AD3d 1360, 1361 n 2 [2019], lv denied 34 NY3d 938 [2019]). A claim of ineffective assistance of counsel "must be supported with proof 'that [the] attorney failed to provide meaningful representation' and that there was no 'strategic or other legitimate explanations for counsel's allegedly deficient conduct'" (People v Wolf, 151 AD3d 1459, 1460 [2017], lv denied 32 NY3d 1179 [2019], quoting People v Caban, 5 NY3d 143, 152 [2005]; see People v Kelsey, 174 AD3d 962, 965 [2019], lv denied 34 NY3d 982 [2019]; People v Bullock, 145 AD3d 1104, 1106 [2016]). Counsel's performance must be evaluated to determine whether the "tactics and strategies were consistent with those of a reasonably competent attorney. The test is reasonable competence, not perfect representation" (People v Wolf, 151 AD3d at 1461 [internal quotation marks and citations omitted]). "The burden is on the defendant to demonstrate the absence of strategic or other legitimate explanations for counsel's choices" (People v Kelsey, 174 AD3d at 965 [internal quotation marks and citations omitted]).
Defendant alleges, among other things, that counsel failed to effectively cross-examine prosecution witness Courtney regarding another person that he might have seen running after the gunfire. He also faults counsel for failing to advance the theory that Columbus was the shooter based upon phone calls and text messages made by Columbus at the time of the murder. Both of these claims fail. The record reflects that Courtney was cross-examined extensively about his observations related to the shooting. Courtney testified that after he heard gunshots, he saw a man matching defendant's description headed toward him from across the street while he was walking down Washington Avenue. Contrary to defendant's claim, defense counsel challenged Courtney's testimony that he saw no one other than defendant running toward him from the scene of the shooting and persisted in questioning Courtney as to whether other individuals were in the vicinity of where he saw defendant. We find that defense counsel's cross-examination of the witness was proper and did not constitute ineffective assistance.
With respect to defendant's claim that counsel was ineffective for failing to advance the theory that Columbus was the shooter, we find that defendant failed to establish the absence of strategic reasons for failing to do so. During the hearing, Cornell testified that defense counsel was provided with information that when Columbus was interviewed in the early stages of the investigation, Columbus' cell phone, which was not taken as evidence at that time, contained approximately 55 calls and text messages that were made during the late hours of October 18, 2013 and the early morning hours of October 19, 2013 — before and after the shooting. When Columbus' phone was subsequently turned over to police, it appeared that those calls and messages had been deleted. James Olsen, a detective, testified that, although Columbus did not have an explanation for the deletions, he was not a person of interest because the surveillance showed that he was with the victim at the bar and exited with the victim for the purpose of leaving the area to go to his vehicle. Defense counsel was also provided with evidence regarding the bullet holes to Columbus' vehicle, leading the jury to reasonably conclude, if this testimony was introduced to rebut a claim that Columbus was the shooter, that Columbus, upon hearing the shots fired, ran in such haste that his car door remained open and his chain fell off, thus corroborating Columbus' testimony. Further, the evidence showed that Columbus went to the bar to pick up Johnson, while defendant fled the scene. Defense counsel testified at the CPL article 440 hearing that an attempt to portray Columbus as the shooter would have been "highly ineffective given all of the footage [which showed] that everyone that went into that bar was searched very carefully for weapons, and [Columbus] was in there and didn't have a weapon." Defense counsel also recalled that "some kind of a cap" found near the scene of the shooting had defendant's DNA on it. Defense counsel explained that he did not cross-examine Columbus about the deleted phone calls and text messages because they were related to "alleged drug dealing" that could have opened the door to allegations that defendant was involved in drug dealing, providing a motive for the People's case. Defense counsel testified that he chose not to pursue this strategy because he had no reason to believe that Columbus was involved in the shooting and made a strategic decision to focus on the lack of direct evidence against defendant.
Finally, we reject defendant's contention that counsel was ineffective for failing to object to the prosecutor's allegedly improper summation, finding that the prosecutor's summation was proper and fair comment on the evidence. A failure to make arguments that have little chance of success does not amount to ineffectiveness (see People v Kelsey, 174 AD3d at 965).
We find that County Court properly denied defendant's CPL 440.10 motion. In light of defense counsel's strategic reasons for not cross-examining Columbus about the deleted calls and texts or pursuing a strategy that he was the shooter, defendant failed to meet his burden of showing that defense counsel's performance was deficient. This Court "will not second-guess counsel's strategy in that regard" (People v Roulhac, 166 AD3d 1066, 1069 [2018], lv denied 32 NY3d 1128 [2018]). Notwithstanding defendant's criticisms, we find that, viewed in totality, defendant was provided with meaningful representation (see People v. Lindsey, 172 AD3d 1764, 1767 [2019]; People v Taylor, 156 AD3d at 91) We have considered defendant's remaining claims and find that they are without merit.
Garry, P.J., Egan Jr., Mulvey and Aarons, JJ., concur.
ORDERED that the judgment and order are affirmed.



Footnotes

Footnote 1: The charge of conspiracy in the second degree was dismissed prior to trial. Croley's conviction for murder in the second degree was reversed on appeal and the indictment against him was dismissed (People v Croley, 163 AD3d 1056 [2018]).