People v Burton (2023 NY Slip Op 01919)

People v Burton

2023 NY Slip Op 01919

Decided on April 13, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 13, 2023

109834 112642
[*1]The People of the State of New York, Respondent,
v
Dwight D. Burton, Appellant.

Calendar Date:February 23, 2023

Before:Lynch, J.P., Aarons, Pritzker, Fisher and McShan, JJ.

Kathy Manley, Selkirk, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Benjamin E. Holwitt of counsel), for respondent.

McShan, J.
Appeals (1) from a judgment of the County Court of Broome County (Joseph F. Cawley, J.), rendered September 27, 2017, convicting defendant following a nonjury trial of the crimes of arson in the first degree, murder in the second degree (two counts), attempted murder in the second degree, assault in the first degree (two counts), murder in the first degree (three counts) and aggravated criminal contempt, and (2) by permission, from an order of said court, entered March 23, 2020, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
In the early morning hours of October 19, 2015, a fire erupted at a residence in the Village of Johnson City, Broome County that claimed the lives of two children and caused serious injuries to the children's mother (hereinafter the mother) and defendant's ex-girlfriend (hereinafter the ex-girlfriend). Following an investigation, defendant was charged by a 10-count indictment with arson in the first degree, two counts of murder in the second degree, attempted murder in the second degree, two counts of assault in the first degree, three counts of murder in the first degree and aggravated criminal contempt. Defendant thereafter waived his right to a jury trial and was found guilty as charged following a bench trial. In September 2017, defendant was sentenced to concurrent prison terms of life without the possibility of parole for each conviction of murder in the first degree and to lesser concurrent terms of incarceration on the remaining convictions. In June 2019, defendant moved, pro se, pursuant to CPL 440.10 to vacate the judgment of conviction on the grounds of actual innocence, newly discovered evidence, ineffective assistance of counsel and prosecutorial misconduct. County Court denied defendant's motion without a hearing, finding, as is relevant here, that the record demonstrated that defendant was afforded the effective assistance of counsel. Defendant appeals from the judgment of conviction and, by permission, the denial of his CPL 440.10 motion.
Turning first to defendant's weight of the evidence challenge, we must necessarily review whether each element of the crime was proven beyond a reasonable doubt (see People v Hodgins, 202 AD3d 1377, 1379 [3d Dept 2022]; People v Chaneyfield, 157 AD3d 996, 996 [3d Dept 2018], lv denied 31 NY3d 1012 [2018]). In so doing, we must first determine, "based upon all of the credible evidence, [whether] a different verdict would have been unreasonable and, if it would not have been, we then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Taylor, 207 AD3d 806, 807 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 942 [2022]). "[A]s relevant here, the appropriate standard for evaluating a weight of the evidence 
argument on appeal is the same regardless of whether the finder of fact was a judge or a jury" (People v Race, 78 AD3d 1217, 1219-1220 [3d Dept 2010] [internal quotation marks and citation omitted], lv denied 16 NY3d 835 [2011]).
Defendant, in sum and substance, contends that the People failed to establish that he acted with the requisite intent to sustain his convictions for first- and second-degree murder and attempted murder. The trial evidence established that on the evening preceding the fire, the two children and their mother were home in their third-floor apartment, along with the ex-girlfriend and an individual she was dating at the time (hereinafter the paramour). According to the testimony of the mother, at around 9:00 p.m., defendant showed up at her apartment asking to speak with the ex-girlfriend about unauthorized purchases that she may have made using his bank card. An argument ensued in the kitchen between defendant, the ex-girlfriend and the paramour, prompting the mother to ask them to take their conversation outside to avoid waking the children. The three then proceeded downstairs and continued their discussion on the front porch. According to the paramour, he briefly exchanged fighting words with defendant before eventually returning upstairs, leaving defendant and the ex-girlfriend on the porch. The occupant of the second-floor apartment testified that she observed the aforementioned argument and that, afterwards, she briefly spoke with defendant before going inside to have dinner with her children and her former boyfriend (hereinafter the boyfriend), who was residing with her at the time. Similarly, the boyfriend testified that he had observed defendant arguing with someone on the front porch earlier in the day and that he saw him later that evening standing outside of the building with a gas can in his hand.
Meanwhile, according to the mother, the paramour returned upstairs after the argument and proceeded to pack his things and place a bag outside the ex-girlfriend's room. The mother testified that the paramour then sat at the foot of the mother's bed and charged his phone until the ex-girlfriend returned upstairs, at which point the two went to the ex-girlfriend's room for the night. Although the mother noted that she had previously given investigators a statement that the paramour had left the home after initially returning upstairs, at trial she testified that the paramour was still in the home when she locked her door at 10:30 p.m. The mother then fell asleep and awoke to find the apartment filled with smoke. According to the mother, she attempted to get to her bedroom door but was quickly forced to jump out of the window because the room was engulfed in flames. Consistent with that account, the paramour testified that, after going to bed with the ex-girlfriend, he awoke early in the morning and observed a fire coming through the front door of the apartment. According to the paramour, he ran down to the second-floor 
apartment to get help, but when he heard the ex-girlfriend screaming, he went back upstairs and grabbed her before proceeding down the back staircase of the building.
The second-floor occupant testified that she was watching television in her apartment while her boyfriend was asleep on the couch, when she smelled gas and told her boyfriend to investigate. The boyfriend proceeded into the kitchen of their apartment, at which point he observed defendant through the window of the apartment door walking toward him while pouring gas on the second-floor landing. When the boyfriend opened the door, he observed a small fire on the floor in the hallway and defendant standing at the bottom of the stairs. According to the boyfriend, he shouted at defendant, who turned and fled while attempting to cover his face with his jacket. Similarly, the second-floor occupant stated that she looked out of the door of her apartment and saw defendant at the bottom of the stairs with a gas can in his hand. She also testified that defendant was wearing the same jacket he had on when she had encountered him earlier. After she and the boyfriend were able to evacuate the building, the second-floor occupant called 911 and reported that the house was on fire, with the young children in the third-floor apartment, and that defendant was the perpetrator. A recording of the 911 call was introduced at trial and corroborated that the second-floor occupant had reported, immediately after the fire had commenced, that defendant started the fire.
The various responding firefighters testified that they arrived at the scene shortly after 2:00 a.m., initially encountering smoke on the second floor and observing that the fire was at the top of the third-floor stairwell. After gaining access to the third-floor apartment, firefighters recovered the two children, who were pronounced dead at the scene due to smoke inhalation. Consistent with that account, the fire investigator testified that there was light smoke damage to the first floor, heavier smoke damage on the second floor and more heat and fire damage on the third floor. The fire investigator also testified that the fire was incendiary, as there was evidence of gasoline pooling at the second-floor landing leading to the third floor, a trail of ignitable liquid up the stairs and further pooling at the top of the stairs on the third floor. An investigator with the police department testified that when they arrived at defendant's house to ask him to come to the station for an interview, they initially advised him that something had happened to the ex-girlfriend, to which he responded, "F**k that b**ch." Investigators later executed a search of defendant's person at the police department and at defendant's apartment, and secured several articles of clothing, including a black jacket. Investigators noted that inside the left pocket of that jacket was a red plastic safety cap that was consistent with the cap for a gas can. Forensic testing 
on defendant's shoes also revealed the presence of trace amounts of gasoline. Further, law enforcement recovered a black backpack at the scene of the fire, which contained two beer cans along with some personal items and paperwork belonging to defendant.
For his part, defendant testified in his defense and denied any involvement in the fire, suggesting that he was home for the majority of the night. According to defendant, he and the ex-girlfriend had reconciled when he was at her house the evening of the fire and, after she had advised him that she would be by in the morning, he returned home to drink beer and smoke marihuana. Defendant acknowledged that, while he had made a prior statement to police suggesting that he had not left his house the entire night, the trial evidence included surveillance footage from a convenience store shortly after 12:40 a.m. depicting him purchasing two cans of beer and placing them into a black backpack. Defendant stated that he had not informed investigators of this fact simply because they had not asked him and because he was flustered by their questions. According to defendant, his dog woke him up a little after 1:00 a.m., at which point he observed the paramour in his driveway stealing a black item from his vehicle. Defendant explained that he went out to the vehicle after seeing the paramour and observed that his backpack was missing; however, he "[thought] nothing of it" and decided to just go back into his house and go to sleep rather than take any action. Again, defendant acknowledged that he made no mention of this occurrence during his interview with investigators. Defendant also acknowledged that he had left a message with his employer at around 3:30 a.m. stating that he would not be coming in to work, or would have to leave early, suggesting that he had "a lot going on" and had a personal matter to attend to. Defendant attributed that message to the fact that he was feeling ill, but conceded that he had not expressly noted that in the message. Defendant also conceded that the ex-girlfriend had an order of protection against him and that he had admittedly violated that order when he went to see her the evening before the fire.
Although a different verdict would not have been unreasonable in this case had the factfinder credited defendant's version of events, we find that defendant's convictions are in accord with the weight of the evidence. In our view, defendant's contention that the evidence at most establishes that his conduct was reckless is without merit (see generally People v Truitt, 213 AD3d 1145, 1150-1151 [3d Dept 2023]; People v Rodriguez, 209 AD3d 412, 412 [1st Dept 2022], lv denied 39 NY3d 1079 [2023]). To the contrary, defendant's intent to kill the ex-girlfriend, which was transferrable to the child victims, was readily established by defendant's use of an accelerant to light a fire during the early morning hours with knowledge that the residents of the third-floor apartment were home 
(see People v Truitt, 213 AD3d at 1149-1150; People v Jones, 202 AD3d 1285, 1287 [3d Dept 2022]; People v Callahan, 186 AD3d 943, 945 [3d Dept 2020]). As to defendant's contentions directed toward the inconsistencies in the witnesses' testimony concerning their accounts of the timing and details of the fire and whether or not they had properly observed defendant, those matters were fully explored at trial and the record offers no justification for displacing the factfinder's credibility determinations as to their testimony (see People v Lekovic, 200 AD3d 1501, 1504 [3d Dept 2021], lv denied 38 NY3d 1008 [2022]; People v Hackett, 167 AD3d 1090, 1093 [3d Dept 2018]). Similarly, to the extent that defendant suggests that his intent was negated by the fact that he was intoxicated, that determination fell within the province of the factfinder and we find no support in the record to disturb its findings (see People v Ramsoondar, 206 AD3d 1157, 1158 [3d Dept 2022]; People v Scott, 47 AD3d 1016, 1018 [3d Dept 2008], lv denied 10 NY3d 870 [2008]). Altogether, we are satisfied that the evidence, evaluated in a neutral light and according the factfinder the appropriate deference on matters of credibility, supports those convictions that defendant challenges on this appeal (see People v Truitt, 213 AD3d at 1150; People v Dubois, 203 AD3d 1621, 1622 [4th Dept 2022], lv denied 38 NY3d 1032 [2022]; Penal Law §§ 125.27 [1] [a] [vii], [viii]; [b]; 125.25 [1]; see also Penal Law § 110.00).
Defendant next contends that County Court improperly denied his motion to suppress certain statements made during an interview with law enforcement based upon his belief that he had invoked his right to counsel under Miranda. We disagree. "A defendant's request for an attorney will invoke his or her indelible right to counsel if the request is unequivocal, an inquiry which 'is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant' " (People v Higgins, 124 AD3d 929, 931 [3d Dept 2015], quoting People v Glover, 87 NY2d 838, 839 [1995]). "[A] suggestion that counsel might be desired; a notification that counsel exists; or a query as to whether counsel ought to be obtained will not suffice to unequivocally invoke the indelible right to counsel" (People v Dawson, 38 NY3d 1055, 1055 [2022] [internal quotation marks and citations omitted]; see People v Slocum, 133 AD3d 972, 975 [3d Dept 2015], appeal dismissed 29 NY3d 954 [2017]; People v Higgins, 124 AD3d at 931). Defendant points to his statement made during the lengthy discussion with an investigator concerning the need to sign a Miranda waiver before further conversation took place, which prompted defendant to state, "actually, you're wrong, we don't need to do this, I can just, take me back home and you can talk to my lawyer." Moments later, defendant 
interrupted the investigator and stated, "I don't even need a lawyer, if I gotta get a lawyer, you'll have to talk with him." Under these circumstances, we find that defendant's statement that an investigator could talk to his lawyer after he was returned home merely conferred "a forewarning of a possible, contingent desire to confer with counsel rather than an unequivocal statement of defendant's present desire to do so" (People v Higgins, 124 AD3d at 931; see People v Bowman, 194 AD3d 1123, 1129 [3d Dept 2021], lv denied 37 NY3d 963 [2021]; People v Meadows, 180 AD3d 1244, 1245 [3d Dept 2020], lv denied 35 NY3d 994 [2020]). Moreover, defendant's subsequent statement that he did not require a lawyer demonstrated that his initial contingent statement did not, under the facts of this case, constitute an unequivocal assertion of his right to counsel (see People v Glover, 87 NY2d at 839; People v Barski, 66 AD3d 1381, 1382 [4th Dept 2009], lv denied 13 NY3d 905 [2009]; People v Twillie, 28 AD3d 1236, 1237 [4th Dept 2006], lv denied 7 NY3d 795 [2006]; People v Powell, 304 AD2d 410, 410-411 [1st Dept 2003], lv denied 1 NY3d 578 [2003]). Accordingly, we find that the record supports the suppression determination made by County Court.
We are also unpersuaded by defendant's contention that he was improperly excluded from material portions of his trial. "While there can be no doubt that a defendant has a statutory right to be personally present at all material stages of a trial, including sidebar conferences, a key factor in determining whether a defendant has a right to be present during a particular proceeding is whether the proceeding involved factual matters about which [the] defendant might have peculiar knowledge that would be useful in advancing the defendant's or countering the People's position" (People v Bellamy, 34 AD3d 937, 939 [3d Dept 2006] [internal quotation marks, brackets and citations omitted], lv denied 8 NY3d 843 [2007]; see People v Malloy, 152 AD3d 968, 969 [3d Dept 2017], lv denied 30 NY3d 981 [2017]). As conceded by the People, defendant was not provided with Antommarchi warnings until the afternoon of the second day of the trial; however, at the point in which County Court advised defendant of his right to be present at any sidebar conferences, defendant indicated that he had already been made aware of that right by his counsel. In any event, the sidebar that defendant takes exception to occurred during the People's case-in-chief and concerned whether the ex-girlfriend was too distraught to testify at that point. Thus, even assuming the truth of defendant's assertion that he had peculiar knowledge as to the reason for the ex-girlfriend's emotional state at that point, such knowledge would not have advanced his defense, as the People had the discretion to present witnesses in whatever order they saw fit (see People v Levy, 52 AD3d 1025, 1028 [3d Dept 2008]; see also People v Bellamy, 34 AD3d at 939). Although defendant suggests that 
the remaining sidebars were also material stages of trial from which he was improperly excluded, he offers no meaningful support for his position that he possessed any peculiar knowledge that would aid in any discussions concerning the court's determinations allowing or disallowing certain witnesses to be recalled (see People v Rodriguez, 85 NY2d 586, 591 [1995]; People v Rodriguez, 76 NY2d 918, 921 [1990]; see also People v Vargas, 60 AD3d 1236, 1239 [3d Dept 2009], lv denied 13 NY3d 750 [2009]) or any specific facts controverting County Court's determination that the remaining conferences largely concerned procedural matters rather than any substantive issues (see People v DePallo, 96 NY2d 437, 443 [2001]; People v Foote, 121 AD3d 1292, 1293 [3d Dept 2014], lv denied 25 NY3d 950 [2015]). Accordingly, we discern no reversible error under these circumstances.
As to his claims of ineffective assistance of counsel, it is well established that "defendant [must] demonstrate . . . that there is an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Reichel, 211 AD3d 1090, 1091 [3d Dept 2022] [internal quotation marks and citations omitted]). "As long as the defense reflects a reasonable and legitimate strategy under the circumstances and evidence presented, even if unsuccessful, it will not fall to the level of ineffective assistance" (People v Benevento, 91 NY2d 708, 712-713 [1998] [citation omitted]; see People v Berroa, 99 NY2d 134, 138 [2002]). Because defendant's "contentions raise both record-based and nonrecord-based allegations of ineffectiveness, they will be addressed together in their entirety in the context of defendant's appeal from the denial of his CPL 440.10 motion" (People v White-Span, 182 AD3d 909, 914 [3d Dept 2020], lv denied 35 NY3d 1071 [2020]; see People v Hatcher, 211 AD3d 1236, 1239 [3d Dept 2022], lv denied 39 NY3d 1078 [2023]).
To begin, we perceive no deficiency in counsel's conduct concerning his various efforts at suppression. During the Huntley hearing, counsel appropriately focused his efforts on casting doubt on the voluntariness of defendant's statements to investigators. Moreover, defendant's contention that his counsel failed to argue that he invoked his right to counsel is unpersuasive, as County Court addressed that issue in its determination on defendant's motion and we have ultimately deemed defendant's contention, raised on appeal, as meritless (see People v Calafell, 211 AD3d 1114, 1120 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Reichel, 211 AD3d at 1091). As to his trial-related contentions, defendant does not suggest that he was precluded from offering evidence pertaining to a third-party culpability defense (compare People v DiPippo, 27 NY3d 127, 136 [2016]; People v Negron, 26 NY3d 262, 269 [2015]); rather, his argument is rooted in his belief that his counsel failed to pursue that theory of defense at all. However, contrary to defendant's 
assertion, we find that counsel adequately explored the paramour's potential culpability through cross-examination as to the paramour's inconsistent statements to investigators and testimony from other witnesses potentially casting doubt on whether the paramour was in the apartment prior to the fire.[FN1] Moreover, our review of the record satisfies us that counsel pursued a cogent strategy at trial focused on casting doubt on the credibility and recollection of the various witnesses' accounts of the events leading up to and following the fire, adequately examining the inconsistencies with prior statements given closer to the date of the incident regarding the timing of the fire and the potential misidentification of defendant (see People v Rivera, 212 AD3d 942, 949 [3d Dept 2023]; People v Smith, 193 AD3d 1260, 1268 [3d Dept 2021], lv denied 37 NY3d 968 [2021]; People v Sposito, 193 AD3d 1236, 1241 [3d Dept 2021], affd 37 NY3d 1149 [2022]). In this context, we find that defendant's remaining arguments directed at the sufficiency of the scope of counsel's direct and cross-examination of several witnesses are merely reflective of defendant's disagreement as to counsel's strategies and tactics weighed with the benefit of hindsight (see People v Agan, 207 AD3d 861, 870 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]; People v Cook, 206 AD3d 1236, 1241 [3d Dept 2022]; People v Smith, 193 AD3d at 1268).
We also reject defendant's contention that counsel's decision not to call the ex-girlfriend lacked any strategic basis. The record reflects that, although defendant and counsel disagreed as to whether the ex-girlfriend should be called as a witness, his counsel corresponded with defendant numerous times before trial regarding counsel's review of the ex-girlfriend's various contradictory statements and counsel advised defendant as to his belief that she would not be an effective witness. At trial, the ex-girlfriend was appointed counsel owing to her indication to the People at an earlier stage of trial that she intended on testifying in a manner different than her prior statement to investigators and, on the day of trial that she was present to testify pursuant to subpoena, her counsel indicated that she was "adamant" in her desire not to testify. In light of the serious concerns regarding her credibility and her apparent reluctance to testify, counsel's decision not to call the ex-girlfriend cannot be characterized as devoid of any strategic or legitimate reasoning (see People v Delbrey, 179 AD3d 1292, 1299 [3d Dept 2020], lv denied 35 NY3d 969 [2020]; People v Wheeler, 124 AD3d 1136, 1139 [3d Dept 2015], lv denied 25 NY3d 993 [2015]; People v Nichols, 289 AD2d 605, 606 [3d Dept 2001], lv denied 98 NY2d 639 [2002]; see also People v De Fayette, 16 AD3d 708, 709 [3d Dept 2005], lv denied 4 NY3d 885 [2005]). Altogether, "[c]onsidering the sum of defendant's contentions in the context of counsel's representation in its totality, we cannot 
say that this decision or any other, cumulatively or in isolation, deprived defendant of meaningful representation" (People v Gonyea, 211 AD3d 1102, 1106 [3d Dept 2022] [internal quotation marks and citation omitted]; see People v White-Span, 182 AD3d at 916). Further, we find that County Court did not abuse its discretion in resolving defendant's ineffective assistance contentions contained in his CPL article 440 motion without a hearing (see People v Hardie, 211 AD3d 1418, 1421 [3d Dept 2022]; People v Gonyea, 211 AD3d at 1106; People v Byrd, 174 AD3d 1133, 1134-1135 [3d Dept 2019], lv denied 34 NY3d 979 [2019]).
We reject defendant's contention that his sentence is harsh and excessive. Although defendant received the maximum sentence, the crimes underlying defendant's convictions were heinous and resulted in the deaths of two young children. At sentencing, the children's parents recounted the continuing effect of their loss, and the presentence investigation reflects that defendant has demonstrated no remorse for his actions. Considering the totality of circumstances presented by this case, and in light of defendant's prior criminal history, we decline to disturb his sentence (see People v Diaz, 213 AD3d 979, 984 [3d Dept 2023]; People v Burdo, 210 AD3d 1306, 1311 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]).
Finally, we agree with defendant's contention that his convictions for second degree murder (counts 2 and 3) must be dismissed as inclusory concurrent counts of his convictions for murder in the first degree (counts 7, 8 and 9) (see CPL 300.40 [3] [b]). Accordingly, we reverse defendant's convictions for murder in the second degree and dismiss the corresponding counts in the indictment (see People v Miller, 6 NY3d 295, 303 [2006]; People v Truitt, 213 AD3d at 1151-1152; People v Jeremiah, 147 AD3d 1199, 1206 [3d Dept 2017], lv denied 29 NY3d 1033 [2017]). Defendant's remaining contentions, to the extent they are not directly addressed herein, have been considered and found to be without merit.
Lynch, J.P., Aarons, Pritzker and Fisher, JJ., concur.
ORDERED that the judgment is modified, on the law, by reversing defendant's convictions of murder in the second degree under counts 2 and 3 of the indictment; said counts dismissed and the sentences imposed thereon vacated; and, as so modified, affirmed.
ORDERED that the order is affirmed.

Footnotes

Footnote 1: Notably, while defense counsel did not cross-examine the paramour on a prior arson he was involved in as a minor, the People elicited information on that conviction during their direct examination.