People v Khalil (2022 NY Slip Op 03950)

People v Khalil

2022 NY Slip Op 03950

Decided on June 16, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 16, 2022

112974
[*1]The People of the State of New York, Respondent,
v
Ahmed Khalil, Appellant.

Calendar Date:April 26, 2022

Before:Egan Jr., J.P., Lynch, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Tully Rinckey PLLC, Rochester (Peter J. Pullano of counsel), for appellant.
Gary M. Pasqua, District Attorney, Canton (Matthew L. Peabody of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the County Court of St. Lawrence County (McKeighan, J.), rendered June 29, 2020, upon a verdict convicting defendant of the crimes of stalking in the first degree, unlawful imprisonment in the second degree, menacing in the third degree, harassment in the second degree, petit larceny, grand larceny in the fourth degree and criminal mischief in the fourth degree.
Defendant and the victim were involved in a relationship in the spring and summer of 2018. Following an incident during which defendant confined the victimand took her cellphone when she tried to call the police, leading her to jump out of defendant's car and flee into a church to escape him, defendant was charged in an eight-count indictment with stalking in the first degree, unlawful imprisonment in the second degree, menacing in the third degree, harassment in the second degree, two counts of petit larceny, grand larceny in the fourth degree and criminal mischief in the fourth degree. Defendant moved to dismiss the indictment on statutory speedy trial grounds, which motion was denied by County Court. Following a jury trial, defendant was convicted of all of the charges with the exception of one count of petit larceny. He was thereafter sentenced to a prison term of four years followed by three years of postrelease supervision for his conviction of stalking in the first degree, a concurrent prison term of one to three years for his conviction of grand larceny in the fourth degree, and time served for the remaining convictions. Defendant appeals.
Defendant first argues that he was deprived of his statutory right to a speedy trial. The People are required to announce readiness for trial within 90 days when a defendant is charged with a misdemeanor, and within six months when he or she is charged with a felony (CPL 30.30 [1] [a], [b]). "Whether the People complied with this obligation is determined by computing the time elapsed from the filing of the first accusatory instrument and the People's declaration of readiness, subtracting any periods of delay that are excludable under the terms of the statute and then adding to the result any postreadiness periods of delay that are actually attributable to the People and are ineligible for an exclusion" (People v Pentalow, 196 AD3d 871, 872 [2021] [internal quotation marks and citations omitted]).
On August 25, 2018, defendant was arraigned in local criminal court on three informations charging him withthe misdemeanors of unlawful imprisonment in the second degree and menacing in the third degree, as well as the violation of harassment in the second degree. The People declared their readiness for trialfive days later, on August 30, 2018. Thereafter, between August 31, 2018 and July 11, 2019, defense counsel made successive written requests to adjourn the proceedings. On July 11, 2019, the People filed an indictment containing the three initial charges as well as five new charges, including two felonies[*2], and announced their readiness for trial with respect to it.
Defendant contends that the People's initial declaration of readiness on August 30, 2018 was rendered illusory by the filing of the indictment, such that the approximately 10½ months that passed between his arraignment on August 25, 2018, and the People's announcement of readiness on the indictment on July 11, 2019, should be charged to the People. This contention is without merit (see People v Morales, 309 AD2d 1065, 1066 [2003], lv denied 1 NY3d 576 [2003]). Where the charges set forth in an indictment are directly derived from previously-filed accusatory instruments in that they stem from the same criminal transaction, the indicted charges relate back to the date of the filing of the earlier accusatory instrumentsboth for purposes of calculating the period within which the People must declare readiness (see People v Osgood, 52 NY2d 37, 45 [1980]) and for computing any excludable time (see People v Sinistaj, 67 NY2d 236, 237 [1986]; People ex rel. Greenstein v Sheriff of Schenectady County, 220 AD2d 190, 193 [1996]).
Preliminarily, we agree with defendant that all of the charges set forth in the indictment arose out of the same criminal transaction as that alleged in the local criminal court informations, such that they all relate back to the informations.Therefore, the speedy trial clock began to run on August 25, 2018, the date of the filing of the informations, and we must determine whether any of the time between that date and the People's announcement of readiness on July 11, 2019 can be excluded from the speedy trial calculation.
In that regard, "the period of delay resulting from a continuance granted by the court at the request of, or with the consent of, the defendant or his or her counsel" is excludable (CPL 30.30 [4] [b]; see People v Abdullah, 133 AD3d 925, 927 [2015], lv denied 27 NY3d 990 [2016]). Although the People are charged with the five days of delay from August 26, 2018 to August 30, 2018, the period beginning on August 31, 2018 and continuing through July 11, 2019 is excluded from the speedy trial calculation due to defendant's own adjournment requests. Accordingly, defendant's speedy trial rights were not violated (see People v Skinner, 211 AD2d 979, 979 [1995], lv denied 86 NY2d 741 [1995]). We also reject defendant's argument that the People violated notions of "fundamental fairness" by waiting over 10 months to present the case to a grand jury, as defendant's speculative assertion that the People engaged in tactical delay is unsupported by the record (see People v Grey, 150 AD2d 823, 824 [1989], lv denied 74 NY2d 810 [1989]).
Next, defendant claims that his conviction for grand larceny in the fourth degree is not supported by legally sufficient evidence and is against the weight of the evidence, and that his remaining convictions are against the weight of the evidence. "When conducting a legal sufficiency analysis, we view the evidence in the [*3]light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v LaDuke, 204 AD3d 1083, 1084 [2022] [internal quotation marks and citations omitted]). "In assessing whether a verdict is supported by the weight of the evidence, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable, and, if it would have been reasonable for the jury to reach a different conclusion, then we must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine whether the jury has failed to give the evidence the weight it should be accorded" (People v Cade, 203 AD3d 1221, 1221—1222 [2022] [internal quotation marks, brackets and citations omitted]). Our weight of the evidence "analysis entails viewing the evidence in a neutral light and giving deference to the jury's credibility assessments" (People v Kiah, 156 AD3d 1054, 1055 [2017] [internal quotation marks and citations omitted], lvs denied 31 NY3d 981, 984 [2018]).
According to the victim's testimony at trial, her relationship with defendant, who shares her Muslim faith, was brief and tumultuous, marked by her increasing fear of defendant, who verbally abused her and prevented her from seeing her friends or moving about freely. The tension in the relationship escalated, culminating in the events giving rise to the charges in this case. On the evening of August 22, 2018, the two argued, and the victim attempted to find a place on her college campus where defendant would not find her, so she could study for an exam that she was scheduled to take the next morning. Defendant, however, ultimately found her and slept beside her while she studied all night.
On the morning of August 23, 2018, according to the victim, she wanted to take a shower before her exam, so they left the victim's car on campus and went in defendant's car to their shared residence, a recreational vehicle (hereinafter the RV). While in the RV, the two continued the argument that had begun the night before, wherein the victim was telling defendant that their relationship was not working. Defendant shouted that it was not for the victim to decide whether to leave or stay. He repeatedly told her "your ass is mine," and said that he would be the one to decidewhether to kick her out of the RV and his life. He threatened to have her deported and to cause her family to be ashamed of her. The victim, who by this point was in the bathroom wearing only underwear, felt frightened for her life and tried to call the police, but defendant grabbed her phone from her, leaving marks on her wrists, and began taking pictures [*4]of her. He then locked the door of the RV, closed the curtains, and told the victim that she was not leaving until he told her to. The victim testified that defendant then took her perfume and a piece of cotton and began cleaning under her fingernails, telling her that he was removing his skin from where she had scratched him so it would appear that "nothing ha[d] happened." The victim missed her exam that morning.
The victim later convinced defendant to drive her to a doctor's appointment and then back to campus to speak to her adviser, but defendant refused to return her phone to her. She did not tell anyone at the doctor's office what was happening, but she did email two friends while she was at school, asking for help and telling them that she was in trouble. The victim asked one friend to pick her up, and the friend agreed, but defendant picked her up before the friend arrived. Defendant and the victim drove around for a time, and when they pulled up to a stop sign, the victim tried to exit the vehicle, but defendant kept driving and ran through two red lights. He then drove to an isolated area and began searching her for recording devices. The victim again tried to run away from the car but defendant ran after her and brought her back. Defendant then went to a drive-through window to purchase coffee, keeping the receipt and telling her it was proof that they were having "a regular day" and "nothing has happened." Ultimately, the victim jumped out of the car while it was still moving and fled into a church. A couple she encountered there gave her a ride back to her campus. She met with a campus security officer, who took pictures of the marks on her wrists, after which she spent the night in a safe house.
On August 24, 2018, according to the victim's testimony, she returned to the RV with a sheriff's deputy to retrieve her belongings, but defendant initially refused to let them enter. Defendant eventually relented, but used his cell phone to film the victim and the deputy. The victim had trouble finding her belongings, which were strewn about the RV in places where she did not keep them. She found her purse, containing her wallet, credits cards, driver's license and keys, "hid[den] in the back side of the bed." The deputy lifted a mattress and found a folder containing the victim's important personal documents. When the victim located her phone under a pile of other items, the SIM card was missing. Upon finding the SIM card and placing it back in the phone, the victim discovered that the phone had been used to send messages to her family stating "I am a whore," that she was dating a Christian man, and that she had a sexually transmitted disease, as well as pictures of her in a bathing suit. As a result of these messages, the victim's family disowned her, although they later reconciled.
The deputy testified and corroborated the victim's version of events. The People also introduced the video taken by defendant during [*5]the search for the victim's belongings, as well as text messages between defendant and the victim. Additionally, the People presented testimony from an expert witness regarding the victim's Muslim culture. This witness testified that Muslim women are often reluctant to report domestic abuse because they can be seen as "tarnished," and honor killings can occur when a woman has been perceived as behaving in a manner of which her male family members do not approve. A witness who encountered the victim on August 23, 2018 testified that she would not make eye contact and kept looking behind her. One of the friends who received an email from the victim that day testified that she indicated in the email that she feared for her life. The friend testified that upon seeing the victim later at the safe house, she was disoriented and crying.
Defendant testified on his own behalf. According to defendant, on the morning of August 23, 2018, he and the victim both overslept, causing the victim to miss her exam. The two drove to the victim's appointments together and went out to eat. Defendant testified that at one point, the victim became suicidal, and she got out of the car and purposefully tried to get hit by another car. He ran after her and asked her to come back to the car, and she complied. Eventually, defendant dropped the victim off at the church and, at that point, based on something the victim had said, defendant was concerned for his own life and the lives of his family.
Turning to defendant's legal sufficiency challenge with respect to the count of grand larceny in the fourth degree, pertaining to the victim's purse, as relevant here, a person is guilty of this crime when he or she, with an intent to deprive another of property by permanently withholding it, steals property consisting of a credit or debit card (see Penal Law §§ 155.00 [3], 155.30 [4]). "Larcenous intent is rarely susceptible of proof by direct evidence, and must usually be inferred from the circumstances surrounding the defendant's actions" (People v Michaels, 132 AD3d 1073, 1075 [2015] [internal quotation marks and citations omitted]). Viewing the evidence in the light most favorable to the People, we conclude that there is legally sufficient proof supporting each element of this crime — namely, that after the victim had escaped from the vehicle, defendant took her purse containing credit cards and brought it into the RV, where, after some difficulty, it was discovered hidden behind a bed, a place where the victim normally did not keep it.
As for defendant's weight of the evidence argument pertaining to all of the counts, a different verdict would not have been unreasonable, given that defendant testified and provided an exculpatory version of the events in question. Ultimately, however, "[t]he conflicting testimony of the victim and defendant presented a classic he-said she-said credibility determination for the jury to resolve" (People v Kiah, 156 AD3d at 1056 [internal [*6]quotation marks and citation omitted]). Viewing the evidence in a neutral light and deferring to the jury's determination that the victim's version of events was credible, we find that the verdict is supported by the weight of the evidence.
Finally, we find defendant's claim that his sentence is harsh and excessive to be unavailing. Noting that the sentence fell within the permissible statutory range, and taking into account the seriousness of defendant's conduct, we perceive no basis upon which to modify the aggregate sentence, notwithstanding defendant's lack of a criminal history (see People v Kruppenbacher, 163 AD3d 1266, 1267 [2018], lv denied 32 NY3d 1065 [2018]; People v Edwards, 43 AD3d 496, 497 [2007]).
Egan Jr., J.P., Lynch, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.