People v Lall (2024 NY Slip Op 00338)

People v Lall

2024 NY Slip Op 00338

Decided on January 25, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 25, 2024

112096
[*1]The People of the State of New York, Respondent,
v
Tarchand Lall, Appellant.

Calendar Date:December 13, 2023

Before:Garry, P.J., Lynch, Reynolds Fitzgerald, McShan and Mackey, JJ.

Timothy S. Brennan, Albany, for appellant, and appellant pro se.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Reynolds Fitzgerald, J.
Appeal from a judgment of the County Court of Schenectady County (Matthew J. Sypniewski, J.), rendered February 27, 2019, upon a verdict convicting defendant of the crimes of murder in the first degree, conspiracy in the second degree, criminal possession of a weapon in the second degree (two counts) and life settlement fraud in the second degree.
On November 19, 2016, the victim, an employee of defendant, was found murdered outside of his home in the City of Schenectady. Defendant was alleged to have orchestrated a murder-for-hire scheme involving the shooting death of the victim in an effort to receive his life insurance proceeds. Defendant was initially interviewed by the
police on two occasions.[FN1] Defendant does not appeal any aspect of the first interview. On the second occasion, he received Miranda warnings and his interview was recorded. Ultimately, defendant and codefendants Joevany Luna and Kyshaan Moore were charged, by a joint indictment, with murder in the first degree, conspiracy in the second degree and two counts of criminal possession of a weapon in the second degree. Defendant was also charged with life settlement fraud in the second degree. Thereafter, defendant moved to suppress certain statements made to the police during his second recorded interview, which, after a Huntley hearing, was denied by County Court. Defendant was subsequently additionally charged by a single-count indictment with criminal solicitation in the second degree for conduct occurring while he was in the Schenectady County Jail during July and August 2017.
The indictments were consolidated, and defendant was tried on all six counts. After a jury trial, defendant was acquitted of criminal solicitation in the second degree and was convicted of all other charges. County Court sentenced defendant to prison terms of life without the possibility of parole for his conviction of murder in the first degree, 8&frac13; to 25 years for his conviction of conspiracy in the second degree, 5 to 15 years for his conviction of life settlement fraud in the second degree, all to run consecutively, and a prison term of 15 years followed by five years of postrelease supervision for each count of criminal possession of a weapon, to run concurrently with each other but consecutively with the conspiracy and life settlement fraud convictions. Defendant appeals.
Defendant challenges the verdict as unsupported by legally sufficient evidence and against the weight of the evidence, arguing that the People's proof was largely circumstantial in nature and that the witnesses were not credible. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime[*2][s] charged" (People v Harris, 206 AD3d 1063, 1064 [3d Dept 2022] [internal quotation marks and citations omitted]); see People v Khalil, 206 AD3d 1300, 1302 [3d Dept 2022], lv denied 38 NY3d 1188 [2022]; cert denied ___ US ___, 143 S Ct 2439 [2023]). "In assessing whether a verdict is supported by the weight of the evidence, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable, and, if it would have been reasonable for the jury to reach a different conclusion, then we must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine whether the jury has failed to give the evidence the weight it should be accorded" (People v Galusha, 211 AD3d 1421, 1422 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1154 [2023]; see People v Harris, 206 AD3d at 1064). "[W]e do not distinguish between direct or circumstantial evidence in conducting a legal sufficiency and/or weight of the evidence review" (People v Gilmore, 200 AD3d 1184, 1188 [3d Dept 2021] [internal quotation marks and citation omitted], lv denied 38 NY3d 927 [2022]; see People v Truitt, 213 AD3d 1145, 1147 [3d Dept 2023], lv denied 39 NY3d 1144 [2023]).
As relevant here, "[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person; and . . . the defendant committed the killing or procured commission of the killing pursuant to an agreement with a person other than the intended victim to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement or from a person other than the intended victim acting at the direction of a party to such agreement" (Penal Law § 125.27 [1] [a] [vi]). Murder in the first degree is a class A-I felony (see Penal Law § 125.27). "A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he [or she] agrees with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.15). With respect to count 3 of the indictment, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]). As to count 4, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm" and the possession occurs outside of the person's home or place of business (Penal Law § 265.03 [3]). "A person is guilty of life settlement fraud in the second degree when he or she commits a fraudulent life settlement act and thereby wrongfully takes, obtains or withholds, or attempts to wrongfully take, obtain [*3]or withhold property with a value in excess of [$100,000]" (Penal Law § 176.60).
At the trial, the victim's roommate testified that he began working for the victim in the spring 2016 performing construction and other labor-intensive odd jobs and began residing in the victim's home sometime during the summer of that same year. On the night before the victim's body was discovered, he attended a party with the victim, but stated that he left the party early and alone. He further testified that he called the victim to let him know that he had left, and the victim told him that he was getting a ride home from defendant. When the roommate returned to the home the next morning, he found the victim outside lying on the walkway near the back porch.
The Schenectady Fire Department was dispatched to the victim's home at approximately 7:00 a.m. on the morning of November 19, 2016 for a "man down" call. Ultimately, the victim was pronounced dead at the scene. A detective with the Schenectady Police Department testified that he photographed the scene, collected a 9 millimeter shell casing located near the victim's body and the victim's cell phone, but did not find any fingerprints or DNA evidence. A neighbor testified that he heard a loud bang, which he knew to be a gunshot, between 12:30 and 1:00 a.m. on November 19. A second neighbor testified to hearing a loud "pap" that caused her to wake up and look at her clock, which read 1:28 a.m. The Rensselaer County Medical Examiner testified that, as a result of the autopsy he conducted, he determined the cause of death to be severe spinal cord injury due to a gunshot wound to the neck.
A detective with the Schenectady Police Department testified that he interviewed defendant the day after the victim's body was found because defendant had driven the victim home from a party the night before his body was discovered. During the interview, defendant consented to the police extracting data from his cell phone. A lieutenant with the Schenectady Police Department testified that he performed the cell phone extraction on the victim's and defendant's cell phones. The data from the extraction of the cell phones revealed that the victim received three telephone calls from a (484) area code number starting shortly before 1:00 a.m., with the last call received at 1:22 a.m. on November 19, 2016. This (484) area code number also appeared on defendant's phone on October 29, 2016. The phone contained a deleted text message from three days before the murder that identified a person's name and Wilmington, Delaware. Defendant's phone data also revealed text messages with an insurance agent concerning a life insurance policy on the victim's life.
An agent for Primerica Financial Services testified that the company offers insurance, including life insurance. The agent described that in order to purchase and name a beneficiary for a life insurance policy, a person must have an insurable interest in the insured's life. For example, an insurable [*4]interest could be a family member who is dependent on the insured's income or a business partner who generates income for a business. If it was the latter, the beneficiary of the policy would be the business, not an individual. He stated that defendant contacted him in April 2016 and told him he wanted to obtain a life insurance policy for the victim,[FN2] The agent averred that he had previously been contacted by defendant in January 2016 to obtain a life insurance policy for a different employee, that he eventually met defendant and the employee who listed defendant's address as his own and arranged for a $250,000 policy and that defendant paid for the premiums. However, in that case, the employee named his girlfriend as beneficiary. alleging that the victim was defendant's domestic partner. All arrangements were made through defendant, and the agent eventually met defendant and the victim at a house they were renovating. He arranged for a $150,000 policy that named defendant as the beneficiary and also as the contact person on the policy. The payments were electronically transferred from defendant's Trustco bank account. The agent testified that in August and November 2016, defendant contacted him to ensure that the victim's life insurance policy was in effect, and two days after the victim's death, defendant contacted him to file a claim. An investigator for Primerica read the victim's obituary and noticed that it did not list defendant. When the agent questioned defendant about the obituary, defendant stated that they were not domestic partners, and were instead business partners. The agent averred that had this information been given to him initially, he would not have written the policy as it was; instead, there would have had to be a buy/sell agreement and the business would have paid for and been named the beneficiary. He further explained that he told defendant that the claim for the proceeds had not yet been processed because a medical release form, signed by the victim's next of kin, had to be submitted to confirm the victim's medical status. The agent testified that when he suggested to defendant that he have the victim's brother sign the form, defendant stated that he could not because he was afraid that the brother would think that he killed the victim.
Two probation officers testified to each of the codefendants' telephone numbers. An investigator assigned to the Special Investigations Unit of the State Police testified that he analyzed subpoenaed cellular telephone records for defendant, the two codefendants and the victim. Beginning October 27, 2016, there were 36 calls between defendant and codefendant Luna; however, all telephone contact between the two ceased on November 19, 2016. There were five telephone calls between defendant and codefendant Luna starting at 12:46 p.m. on November 18, 2016 and terminating at 1:37 a.m. on November 19, 2016. The investigator averred that Luna's phone contacted the victim three times near the victim's [*5]residence with the last call being placed at 1:22 a.m. As to the contact between the codefendants' cell phones, the investigator testified that they had extensive contact between October 2016 and November 2016. On November 18, 2016 there was telephone contact between the two starting at 11:37 a.m. until approximately 6:00 p.m. At that time, the codefendant's cell phones "collocated," meaning that their cell phones are simultaneously communicating with the same cell phone towers as they moved north from Wilmington, Delaware, through New Jersey and into New York. The investigator stated that the codefendants' cell phones hit towers near defendant's residence and the victim's residence. The cell phone records also show the codefendants' return trip to Wilmington, Delaware immediately following the last call to the victim.
An investigator with the State Police testified that by accessing the license plate reader database and the cell site sector database, he ran a search beginning at 10:26 p.m. on November 18, 2016, from the southern-most license plate reader in the state to the Albany area and back, and the results produced only one vehicle within the parameters of the search, a 2015 Mazda sedan with a Pennsylvania plate J * * * * * 7 registered to codefendant Moore's girlfriend. The investigator testified that the vehicle was a maroon/red color.
The chief technical resource officer of the Schenectady County District Attorney's office testified that upon learning of the homicide, he saved the information recorded on the surveillance cameras [FN3]
located throughout the City of Schenectady on November 19, 2016 between the hours of 12:00 a.m. and 3:00 a.m. A camera was located at the intersection directly in front of defendant's residence. The officer testified that upon reviewing the recorded data he viewed a vehicle, without a front license plate, pull up to defendant's residence at approximately 12:18 a.m. The camera recorded two individuals in the front seats of the vehicle and, at approximately 12:32 a.m., recorded an individual next to, but outside, the vehicle, who then walked toward defendant's house. The cameras track the vehicle heading toward the victim's residence and subsequently taking the same route out of the city. A video of the car en route was introduced as evidence and played for the jury. The resource officer also depicted the route taken by the car, as captured by the cameras, on a map in a slide format which was shown to the jury. Two of defendant's long-term next-door neighbors were shown the slide of the map depicting the vehicle parked at the curb and testified that the car was parked outside of defendant's residence. The neighbors were also shown a still photograph depicting the person next to the vehicle and identified that individual as defendant.
Codefendant Moore's girlfriend testified that she was in a relationship and living with Moore in the fall 2016, and that they resided in Chester, Pennsylvania, about 10 minutes from [*6]Wilmington, Delaware. At that time, she owned a red four-door Mazda 6, without a front license plate,[FN4]
and that she and Moore were the only ones who had access to the vehicle. She averred that she never drove the vehicle to New York. Next, codefendant Luna's former girlfriend testified that in October and November 2016 she was residing in Wilmington, Delaware and was involved in a romantic relationship with Luna. She confirmed that his cell phone number began with the area code (484), the same as the one extracted from defendant's phone. She avowed that Luna asked her to go pick up a $700 money order for him at Walmart and that she signed a receipt for the money. When she asked Luna what the money was for, he said to go to New York. She stated that when she kept pestering Luna to let her go with him to New York, he eventually told her that he was going to upstate New York to kill somebody and that he was getting paid $10,000 to do it. She testified that a short time after she picked up the money order, he left for New York in a burgundy car. He returned to her apartment around 5:00 a.m. the following morning and took his semi-automatic gun apart, smashed it and soaked it in bleach. Luna told her that he ran up to the guy, killed him and then came home. She further testified that Luna said he threw away his cell phone and asked her to report it as stolen or lost.
An employee of defendant testified that defendant gave him $700 and asked him to send the money to an individual in Wilmington, Delaware. He averred that he sent a money order from Walmart to the individual and signed a receipt. A detective with the Schenectady Police Department testified that a warranted search of defendant's residence produced the insurance policies for the victim and another employee and the money order receipt, all of which was offered as evidence at the trial.
An individual incarcerated in the Schenectady County Jail at the same time as defendant testified that defendant told him he hired a gang member from Delaware to kill somebody for insurance money. Defendant also told him that financial difficulties caused him to take out a life insurance policy on an employee, have the employee list him as a beneficiary and then pay a gang member $10,000 ($5,000 up front and $5,000 upon completion) to kill him.
Defendant's Trustco bank account records were subpoenaed by police and were proffered as a trial exhibit that confirmed monthly insurance premium payments. The records also depicted that defendant withdrew $5,000 cash on November 10, 2016 and again on November 17, 2016.
Viewing the evidence in the light most favorable to the People, defendant's convictions of murder in the first degree and conspiracy in the second degree are supported by legally sufficient evidence. The plan devised between defendant and his codefendants was for the codefendants to travel to New York and kill the victim. The cell phone records, surveillance cameras and license plate readers map the codefendants' [*7]round trip from Delaware to Schenectady and back and show the codefendants stopping at defendant's house then driving to the victim's neighborhood. "When a person is intentionally killed pursuant to a contract [Penal Law § 125.27 (1) (a) (vi)], both parties to the contract, regardless of which one directly causes the death, will be liable under this provision" (William C. Donnino, Prac Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law § 125.27 at 350 [2020 ed]). A jury could have reasonably concluded that defendant and the codefendants jointly planned, prepared for and committed the murder of the victim for pecuniary gain (see People v Rivera, 212 AD3d 942, 947 [3d Dept 2023], lv denied 39 NY3d 1113 [2023]; People v Glanda, 5 AD3d 945, 949 [3d Dept 2004], lv denied 3 NY3d 640 [2004], cert denied 543 US 1093 [2005]). Moreover, the intent to kill can be inferred from the surrounding circumstances and defendant's and the codefendants' actions (see People v Taylor, 196 AD3d 851, 852 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]); People v White-Span, 182 AD3d 909, 910 [3d Dept 2020], lv denied 35 NY3d 1071 [2020]).
As to defendant's weight of the evidence argument, although a different verdict would not have been unreasonable, the evidence supports the verdict (see People v Rivera, 212 AD3d at 947; People v Glanda, 5 AD3d at 949). Contrary to defendant's contention that the People's witnesses were not credible, defendant extensively cross-examined them and explored their demeanor and veracity. As the jury ultimately credited the witnesses' testimony, we find no basis to upset that credibility determination (see People v Drumgold, 206 AD3d 1044, 1046 [3d Dept 2022], lv denied 38 NY3d 1150 [2022]; People v Kocsis, 137 AD3d 1476, 1479 [3d Dept 2016]).
Defendant's convictions for criminal possession of a weapon, based upon accessorial liability, are also supported by legally sufficient evidence and are not against the weight of the evidence. "Accessorial liability does not require that a defendant either possess or have control over the weapon, or that he or she give it to the person who uses it, or even that he or she importunes its use aloud. The People were instead required to prove that defendant knew that [his codefendant Luna] possessed the weapon and shared the state of mind required for the commission of the offense, intentionally aiding [Luna] in such conduct and sharing a community of purpose with him" (People v James, 176 AD3d 1492, 1493 [3d Dept 2019] [internal quotation marks, brackets, ellipsis and citations omitted], lv denied 34 NY3d 1078 [2019]). Based on the testimony that the codefendants were hired to kill the victim, that the codefendants stopped at defendant's house prior to traveling to the victim's house, that the victim died of a gunshot wound and that codefendant Luna destroyed his gun following the trip to New York, the jury could have reasonably concluded that defendant knew that codefendant Luna possessed a loaded [*8]firearm outside of his home or place of business and did so with the intent to unlawfully use it against another and that defendant and the codefendants shared a common purpose and a collective objective (see People v Young, 209 AD3d 1278, 1278 [4th Dept 2022], lv denied 39 NY3d 988 [2022]; People v James, 176 AD3d at 1494-1495; People v Thompson, 75 AD3d 760, 763-764 [3d Dept 2010], lv denied 15 NY3d 896 [2010]).
We find no merit to defendant's contention that his conviction for life settlement fraud in the second degree is not supported by legally sufficient evidence. The testimony by the insurance agent that defendant obtained the insurance policy on the victim's life by alleging that they were domestic partners, that when defendant was questioned by the agent as to the accuracy of this statement defendant admitted it was not an accurate representation, and that defendant would not have been able to obtain the policy in the absence of this fraudulent statement, supports the verdict, which is not against the weight of the evidence (see generally People v Howard, 134 AD3d 1153, 1157 [3d Dept 2015], lv denied 27 NY3d 965 [2016]; People v Alnutt, 101 AD3d 1461, 1462 [3d Dept 2012], lv denied 21 NY3d 941 [2013], cert denied 571 US 1180 [2014]).
Defendant next contends that the statements he made during the second police interview should have been suppressed. We disagree. "[T]he safeguards required by Miranda are not triggered unless a suspect is subject to custodial interrogation" (People v Berg, 92 NY2d 701, 704 [1999] [internal quotation marks and citation omitted]; see People v Moore, 162 AD3d 1123, 1125 [3d Dept 2018]). "The standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (People v Lyons, 200 AD3d 1222, 1223 [3d Dept 2021] [internal quotation marks and citation omitted], lv denied 37 NY3d 1162 [2022]; see People v Pascuzzi, 173 AD3d 1367, 1374 [3d Dept 2019], lv denied 34 NY3d 953 [2019]). When determining whether a suspect is in police custody, various factors are considered including "the location, length and atmosphere of the questioning, whether police significantly restricted [the] defendant's freedom of action, the degree of [the] defendant's cooperation, and whether the questioning was accusatory or investigatory" (People v Eriksen, 145 AD3d 1110, 1111 [3d Dept 2016] [internal quotation marks and citations omitted], lv denied 28 NY3d 1183 [2017]). "A court's determination that a defendant was not in custody is accorded great weight and will not be disturbed unless clearly erroneous" (People v Fragassi, 178 AD3d 1153, 1156 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 1128 [2020]; see People v Vazquez, 145 AD3d 1268, 1270 [3d Dept 2016]).
At the Huntley hearing, a Schenectady Police Department detective testified that he called defendant and asked him to come to the police station, [*9]that defendant drove to the station for the interview, was cooperative, signed a second voluntary consent to search his cell phone, was not handcuffed, was never restrained and was never advised that he could not leave, nor did he request to leave, he was not advised that he was going to be arrested and that he drove himself home after the interview ceased. Defendant's assertions that his personal freedoms were deprived because he was required to be escorted if he left the interview room and that he could not answer his cell phone, did not place him in custody or restraints; rather, these were universal restrictions that applied to the general public. Although defendant was interviewed for approximately six hours, the length of the interview, standing alone, is not indicative of custody (see People v Langlois, 17 AD3d 772, 774 [3d Dept 2005]; People v MacGilfrey, 288 AD2d 554, 556 [3d Dept 2001], lv denied 97 NY2d 757 [2002]). Given the totality of the circumstances present at the time of defendant's interview, and deferring to County Court's factual determinations, defendant's statements were not given in a custodial setting and were properly admitted into evidence (see People v Jackson, 217 AD3d 1271, 1271-1272 [3d Dept 2023], lv denied 40 NY3d 951 [2023]; People v Eriksen, 145 AD3d at 1111). As we have determined that defendant was not in custody at the time of the interview and Miranda safeguards were not triggered, we need not address defendant's contention that the police misrepresented his right to counsel or to remain silent when reading said rights to him. Moreover, this Court lacks jurisdiction to review this contention given that County Court did not render a determination on this issue and we may only review errors or defects that adversely affect defendant (see People v Harris, 35 NY3d 1010, 1011 [2020]; People v LaFontaine, 92 NY2d 470, 473-474 [1998]).
Nor did County Court err in denying defendant's motion to suppress statements he allegedly made to the incarcerated individuals. We reject defendant's contention that they were acting as agents of the People when defendant made the incriminating statements to them. "The Sixth Amendment right to counsel prohibits the use of incriminating statements deliberately elicited from a defendant by government agents" (People v Johnson, 27 NY3d 199, 205 [2016] [citations omitted]). To prevail, defendant must prove that the People were actively involved in, or even encouraged, the informants to volunteer their statements and were "more than passive recipients of information" (People v Bent,160 AD2d 1176, 1177 [3d Dept 1990], lv denied 76 NY2d 937 [1990]). The record discloses that the incarcerated individuals acted independently of the People, that they provided the statements to the People based solely on their own initiatives and that the People were merely passive recipients of the information provided by the informants. As such, the informants were not agents of the government and the court [*10]did not err in denying defendant's motion to suppress the statements (see People v Ozkaynak, 217 AD3d 1376, 1379 [4th Dept 2023], lv denied 40 NY3d 998 [2023]; People v Wakefield, 175 AD3d 158, 171 [3d Dept 2019], affd 38 NY3d 367 [2022], cert denied ___ US ___, 143 S Ct 451 [2022]; People v Burchard, 20 AD3d 818, 820 [3d Dept 2005], lv denied 5 NY3d 851 [2005]).
Defendant additionally contends that County Court erred in allowing codefendant Luna's girlfriend to testify as to statements made by him. We disagree. County Court properly overruled the objection and allowed the testimony under the coconspirator exception to the hearsay rule. Under this exception, "[a] declaration by a coconspirator during the course and in furtherance of the conspiracy is admissible against another coconspirator" (People v Bac Tran, 80 NY2d 170, 179 [1992]; see People v Portis, 129 AD3d 1300, 1301 [3d Dept 2015], lv denied 26 NY3d 1091 [2015]). To admit such evidence, a prima facie case of conspiracy must first be established without recourse to the declaration sought to be introduced. Given the proof as outlined above, County Court correctly determined that the People established a prima facie case of conspiracy sufficient to admit the coconspirator's girlfriend's testimony as to Luna's statements (see People v Trappler, 173 AD3d 1334, 1338 [3d Dept 2019], lv denied 34 NY3d 985 [2019], cert denied ___ US ___, 140 S Ct 1281 [2020]).
Defendant also contends that the People's summation was improper and deprived him of a fair trial. A prosecutor is afforded wide latitude during summation (see People v Abussalam, 196 AD3d 1000, 1009 [3d Dept 2021], lv denied 37 NY3d 1144 [2021]). "In determining whether a reversal is warranted on this ground, we must assess the severity and frequency of the conduct, whether the trial court took appropriate action to dilute the effect of the conduct and whether, from a review of the evidence, it can be said that the result would have been the same absent such conduct" (People v Shamsuddin, 167 AD3d 1334, 1336 [3d Dept 2018] [internal quotation marks and citations omitted], lv denied 33 NY3d 953 [2019]). On summation, defense counsel addressed the credibility of several witnesses, including codefendant Luna's girlfriend. The "various statements challenged by defendant constituted fair commentary on the evidence or were otherwise responsive to defense counsel's summation" (People v Graham, 215 AD3d 998, 1008 [3d Dept 2023] [internal quotation marks, ellipsis, brackets and citation omitted], lv denied 40 NY3d 928 [2023]). Further, the People did not improperly shift the burden of proof to defendant (see People v Hughes, 111 AD3d 1170, 1173 [3d Dept 2013], lv denied 23 NY3d 1038 [2014]; People v Anderson, 89 AD3d 1161, 1162 [3d Dept 2011]). Moreover, County Court's instructions to the jury clearly informed the jury that the People had the burden of proving every element of the crimes and that the burden never shifts from the People to defendant[*11], ameliorating any prejudice to defendant. Our review of the record as a whole fails to disclose that the prosecutor engaged in a flagrant and pervasive pattern of prosecutorial misconduct as to deprive defendant of a fair trial (see People v Hadlock, 218 AD3d 925, 931 [3d Dept 2023], lv denied 40 NY3d 997 [2023]; People v Deshane, 160 AD3d 1216, 1218 [3d Dept 2018], lv denied 31 NY3d 1146 [2018]).
Defendant's claim that he was deprived of the effective assistance of counsel due to the failure to object to the girlfriend's hearsay statements and for failure to specify what evidence should be suppressed as a result of defendant's alleged unlawful arrest is without merit. "[T]o establish a claim of ineffective assistance of counsel, a defendant is required to demonstrate that he or she was not provided meaningful representation and that there is an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Gonyea, 211 AD3d 1102, 1104 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1110 [2023]). As to defendant's assertions, "trial counsel cannot be ineffective for failing to advance an argument that has little or no chance of success" (People v May, 188 AD3d 1309, 1311 [3d Dept 2020] [internal quotation marks and citation omitted], lv denied 36 NY3d 974 [2020]). Further, defendant failed to show that this was neither a strategic choice by counsel nor a tactical decision (see People v Kelsey, 174 AD3d 962, 966 [3d Dept 2019], lv denied 34 NY3d 982 [2019], cert denied ___ US ___, 141 S Ct 2607 [2021]). Overall, the record reflects that defense counsel pursued a rational trial strategy, presented cogent opening and closing statements and vigorously cross-examined witnesses. Defendant was therefore provided with meaningful representation (see People v Reichel, 211 AD3d 1090, 1091 [3d Dept 2022], lv denied 39 NY3d 1113 [2023]; People v Agan, 207 AD3d 861, 870 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]).
As for defendant's challenge to the sentence, although defendant does not have a prior criminal history, we are unpersuaded that the sentence was unduly harsh or severe in view of his failure to accept responsibility for the heinous acts for which he was convicted (see CPL 470.15 [6] [b]; People v Graham, 215 AD3d at 1009; People v Burdo, 210 AD3d 1306, 1311 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]).
Garry, P.J., Lynch, McShan and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1:

Footnote 2:

Footnote 3:The cameras are located throughout Schenectady County with the purpose of aiding law enforcement.

Footnote 4:Pennsylvania does not require a front license plate.