People v Bridges (2023 NY Slip Op 05424)

People v Bridges

2023 NY Slip Op 05424

Decided on October 26, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 26, 2023

110622
[*1]The People of the State of New York, Respondent,
v
David Bridges, Appellant.

Calendar Date:September 6, 2023

Before:Clark, J.P., Aarons, Reynolds Fitzgerald, Ceresia and Fisher, JJ.

Terrence M. Kelly, Albany, for appellant.
P. David Soares, District Attorney, Albany (Daniel J. Young of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the Supreme Court of Albany County (Roger D. McDonough, J.), rendered July 20, 2018, upon a verdict convicting defendant of the crimes of manslaughter in the first degree and endangering the welfare of a child.
In December 2016, defendant moved into the apartment of Rebecca Patrick, who had a one-year-old son (hereinafter the victim) and was also pregnant with defendant's child. On February 6, 2017, defendant and the victim were alone in the apartment when defendant called 911 to report that the victim was not breathing. Emergency responders noted that the victim's body was already cold to the touch, his eyes remained open, his lips were blue and there were bruises of differing ages, too numerous to count, all over his body. The victim was pronounced dead at the hospital, and it was later determined that he succumbed to internal bleeding due to blunt force trauma. An investigation ensued, resulting in defendant being indicted on charges of murder in the second degree, manslaughter in the first degree and endangering the welfare of a child. Following a jury trial, he was acquitted of the murder charge but convicted of the two remaining charges. Supreme Court thereafter sentenced defendant to a term of 25 years in prison followed by five years of postrelease supervision for the manslaughter conviction, and a concurrent one-year jail term for the conviction of endangering the welfare of a child. Defendant appeals.
Defendant first contends that the evidence adduced at trial is not legally sufficient to support the charge of manslaughter in the first degree and that the verdict on that charge is against the weight of the evidence. "When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Rivera, 212 AD3d 942, 944 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1113 [2023]). At the same time, when "conducting a weight of the evidence review, we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Franklin, 216 AD3d 1304, 1306 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 934 [2023]; see People v Watts, 215 AD3d 1170, 1171 [3d Dept 2023]). "Notably, we do not distinguish between direct or circumstantial evidence in conducting a legal sufficiency and/or weight of the evidence review" (People v Truitt, 213 AD3d 1145, 1147 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d [*2]1144 [2023]; see People v Rivera, 212 AD3d at 944). As relevant here, a person is guilty of manslaughter in the first degree when he or she, "[b]eing [18] years old or more and with intent to cause physical injury to a person less than [11] years old, . . . recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person" (Penal Law § 125.20 [4]).
At trial, a forensic pathologist testified about the results of the victim's autopsy. It was determined that the victim had more than 40 bruises, in various stages of healing, all over his face and body, as well as tearing of the connective tissue between the upper lip and gum that was consistent with blunt force trauma. There was severe hemorrhage in the victim's abdomen due to numerous lacerations of the liver and other organs, caused by multiple contemporaneous blunt force traumas that occurred within 30 to 45 minutes prior to the victim's death. According to the pathologist, nothing obstructing the victim's airway or lungs was observed, nor was there any evidence that CPR had occurred, such as bruising on the chest or broken ribs. The pathologist did, however, acknowledge that compressions made on the stomach area in connection with an improper performance of CPR could constitute blunt force trauma that could result in injuries consistent with those sustained by the victim.
Patrick testified that, shortly after defendant moved in with her, he began physically disciplining the victim and telling the victim that he needed to listen to and respect him. Defendant would force the victim to stand in the corner for minutes at a time and would press his head into the wall, causing bruising. Defendant spanked the victim with rolled up paper, informing Patrick that he had looked up this method online and knew that it would not leave bruises. Patrick also saw defendant poke the victim and put his fingers down the victim's throat until the victim cried. Defendant prevented Patrick from comforting the victim, who appeared fearful of defendant, and she became concerned about taking the victim out of the house because people might see his bruises. Instead, she would leave the victim alone with defendant when she needed to go out. On one occasion, Patrick returned home to find the victim bruised and his face swollen, and defendant told her that the victim had fallen. Patrick also discovered at one point that the victim's bottom was severely burned and the skin was peeling. On the morning in question, Patrick left the victim alone with defendant while she went to a doctor's appointment.
A relative of defendant who visited the apartment on the date in issue testified that she saw defendant holding the victim, who had a blank expression on his face and did not appear to be moving. The relative offered to bring the victim to the hospital but defendant declined, stating that there was an open Child Protective Services investigation against [*3]him due to Patrick's allegations that he was abusing her and the victim, and also claiming that the victim was fine and had just bumped his head. The relative left and, a short while later, defendant called the relative and stated that he had performed CPR on the victim due to mucus being stuck in his throat, again indicating that the victim was fine. The relative went back to the apartment and discovered that police and first responders were on the scene.
An audio recording of defendant's panicked 911 call was received in evidence, during which defendant stated, "I've been trying CPR and everything . . . I have him all bruised up because I'm trying to throw everything on this . . . please, please hurry." Evidence of a video recording of the police interview with defendant, in which he gave multiple, varying accounts of what had happened, was also introduced into evidence. Defendant initially told the detective interviewing him that the victim had fallen and appeared to be panting, so defendant gave the victim a "sternum rub," but later discovered that the victim was not breathing, called 911 and gave him CPR. When the detective stated that his story was changing and not making sense, defendant then indicated that the victim had choked on a piece of plastic and defendant performed the Heimlich maneuver on him at least three times to get the plastic out. In this version of events, defendant said that the victim stopped breathing twice and he performed CPR by pressing down on the victim's stomach. Defendant acknowledged that he caused some of the bruising on the victim's body and that he had delayed seeking medical attention. Near the end of the interview, defendant stated, "I know I shouldn't have lied," and further said, "I should be in trouble, I deserve to be in trouble."
A State Police investigator testified about text messages that were extracted from Patrick's and defendant's cell phones. During January 2017, defendant texted his mother that he felt like a "slave" and wanted to move out of Patrick's home. He also acknowledged in text messages to Patrick that they were both always stressed and fighting. Approximately a week before the victim's death, defendant sent Patrick a text message in which he stated that the victim had bitten him and that he was going to "get his ass tomorrow so he knows how it feels." The police also discovered that defendant had performed multiple Internet searches for "thing that don't [sic] leave bruises" and visited web pages entitled "[h]itting someone without leaving a bruise" and "[h]ow [t]o [b]eat your wife." The day before the victim's death was Super Bowl Sunday and defendant's text messages from that night revealed that he was frustrated at being stuck at home when he could have gone out to watch the game. On the morning of the victim's death, defendant texted Patrick that the victim had "started acting a fool."
A fellow incarcerated individual at the Albany County Jail testified that defendant approached [*4]him for legal assistance and ended up relaying multiple accounts of what had happened to the victim. In one version, defendant said that the victim was unresponsive and he was trying different things to revive him, including biting the victim's foot, and eventually ran to a neighbor for help. In a second version, defendant repeated much of that same story, but added that, the night prior, he heard noises coming from another room, which sounded like Patrick hitting the victim. In yet another version, defendant stated that he was trying to get the victim to stop crying by spanking him and "toss[ing] him in the bassinet" and, at one point, he lost his temper and threw the victim up in the air, upon which the victim came down onto defendant's knee "like a body slam" similar to those done by professional wrestlers.
The foregoing evidence, viewed in the light most favorable to the People, is legally sufficient to support the conviction of manslaughter in the first degree (see Penal Law § 125.20 [4]; People v Warrington, 146 AD3d 1233, 1237 [3d Dept 2017], lv denied 29 NY3d 1038 [2017]; People v Nelligan, 135 AD3d 1075, 1077 [3d Dept 2016], lv denied 27 NY3d 1072; People v Tinkler, 105 AD3d 1140, 1143 [3d Dept 2013], lv denied 21 NY3d 1020 [2013]). To that end, the proof showed that the one-year-old victim, who had been alone with defendant, died of multiple blunt force traumas to the abdomen. The evidence further revealed that defendant had previously physically abused the victim and attempted to hide this abuse. In addition, defendant made inconsistent statements regarding what had transpired both to the police and to the incarcerated individual, some of which could be characterized as inculpatory. To the extent that a different verdict could have been reached by the jury had it credited one of defendant's innocent explanations of events, relayed during his police interview or to the incarcerated individual, we defer to the jury's credibility determinations and find that the verdict is not against the weight of the evidence (see People v Stahli, 159 AD3d 1055, 1057 [3d Dept 2018], lv denied 31 NY3d 1088 [2018]; People v Warrington, 146 AD3d at 1237).
Next, defendant argues that Supreme Court erred in denying his motion to sever the count of endangering the welfare of a child from the murder and manslaughter counts, asserting that the jury was improperly permitted to consider the proof of endangering as evidence of propensity to commit murder or manslaughter, resulting in prejudice. Under CPL 200.20 (2) (b), "[t]wo offenses are 'joinable' when[,] . . . [e]ven though based upon different criminal transactions, such offenses, or the criminal transactions underlying them, are of such nature that either proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first." When "offenses [are] properly joined on [*5][this] basis, the court lacks statutory authority to sever" (People v Hajratalli, 200 AD3d 1332, 1337 [3d Dept 2021] [internal quotation marks, ellipsis, brackets and citations omitted], lv denied 38 NY3d 1033 [2022]; see People v Cherry, 46 AD3d 1234, 1236 [3d Dept 2007], lv denied 10 NY3d 839 [2008]). Importantly, "[e]vidence may be deemed material and admissible within the meaning of CPL 200.20 (2) (b) if such proof would be admissible under any of the recognized Molineux exceptions" (People v Bryant, 200 AD3d 1483, 1487-1488 [3d Dept 2021] [internal quotation marks and citation omitted], appeal dismissed 38 NY3d 1158 [2022]). Given that the endangering charge pertained to defendant's abuse of the victim during the approximately two-month period prior to the victim's death, this evidence was relevant, not for a propensity purpose, but rather to show intent, motive and lack of mistake or accident (see People v Bonaparte, 196 AD3d 866, 868 [3d Dept 2021], lv denied 37 NY3d 1025 [2021]; People v Knox, 167 AD3d 1324, 1326 [3d Dept 2018], lv denied 33 NY3d 950 [2019]; People v Conklin, 158 AD3d 973, 975 [3d Dept 2018], lv denied 31 NY3d 1080 [2018]). The evidence supporting the endangering charge also provided "relevant background information and context as to the setting in which the underlying crimes occurred" (People v Knox, 167 AD3d at 1326; see People v Conklin, 158 AD3d at 975). As such, the offenses were joinable and the motion for severance was properly denied (see People v Hajratalli, 200 AD3d at 1337; People v Cherry, 46 AD3d at 1236).
Defendant also claims that Supreme Court erred in admitting two sets of postmortem photographs of the victim. Such "[p]hotographs are admissible if they tend to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered or to be offered" (People v Thibeault, 73 AD3d 1237, 1243 [3d Dept 2010] [internal quotation marks and citations omitted], lv denied 15 NY3d 810 [2010], cert denied 562 US 1293 [2011]). They "should be excluded only if their sole purpose is to arouse the emotions of the jury and to prejudice the defendant" (People v White-Span, 182 AD3d 909, 914 [3d Dept 2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1071 [2020]).
The first set of photographs was taken at the hospital prior to the victim's autopsy. These were admitted without objection, and defendant's present argument is therefore unpreserved for our review (see People v Delbrey, 179 AD3d 1292, 1296 [3d Dept 2020], lv denied 35 NY3d 969 [2020]). The second set of photographs was obtained from Patrick's cell phone and depicted the victim in the hospital after his death, with Patrick at his side. Supreme Court admitted these four selfie photographs over defendant's objection after the People argued that defendant had opened the door to their admission by virtue of his cross-examination of an Albany police detective [*6]who was present in a hospital room with Patrick and the deceased victim. Defense counsel asked the detective whether Patrick had been crying when taking the selfies, and also inquired as to whether Patrick made skin contact with the victim and whether she straddled him. Supreme Court determined that, through this line of questioning, defendant had arguably intimated that Patrick could have caused postmortem injuries to the victim, such that the photographs were relevant to rebut that position. Under these circumstances, and recognizing that the court provided the jury with an appropriate cautionary instruction, we cannot say that the admission of the photographs constituted an abuse of discretion (see People v White-Span, 182 AD3d at 914; People v Heimroth, 181 AD3d 967, 970-971 [3d Dept 2020], lv denied 35 NY3d 1027 [2020]).
Finally, we reject defendant's assertion that the sentence for the manslaughter conviction is harsh and excessive. Defendant's conduct was heinous and cruel, and he has failed to accept responsibility for his actions (see People v Franklin, 216 AD3d at 1313; People v Davis, 200 AD3d 1200, 1208 [3d Dept 2021]).
Clark, J.P., Aarons, Reynolds Fitzgerald and Fisher, JJ., concur.
ORDERED that the judgment is affirmed.