People v Harris (2026 NY Slip Op 01094)

People v Harris

2026 NY Slip Op 01094

Decided on February 26, 2026

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 26, 2026

113364
[*1]The People of the State of New York, Respondent,
vLarry J. Harris, Appellant.

Calendar Date:January 6, 2026

Before:Garry, P.J., Reynolds Fitzgerald, McShan, Powers and Mackey, JJ.

Matthew C. Hug, Albany, for appellant, and appellant pro se.
F. Paul Battisti, District Attorney, Binghamton (Mary E. Saitta of counsel), for respondent.

Reynolds Fitzgerald, J.
Appeal from a judgment of the County Court of Broome County (Joseph Cawley, J.), rendered January 21, 2022, upon a verdict convicting defendant of the crime of manslaughter in the first degree.
In 2019, the victim's mother lived in an apartment on Burbank Avenue in the Village of Johnson City, Broome County with her son (hereinafter the victim), age 11, and daughter. At the time, she was involved in a romantic relationship with defendant and he frequently stayed at the apartment. On February 2, 2019, defendant and the victim were alone in the apartment for several hours while the victim's mother and her daughter went shopping. That afternoon, the victim's mother received a telephone call from defendant stating that the victim was "acting crazy." When she returned to the apartment, she found the victim laid out on the living room couch, naked, cool and unresponsive. She then left the apartment and went to Walgreen's in search of oxygen. While she was gone, defendant called another woman and asked her to come to the apartment to help revive the victim. Eventually, emergency responders arrived to find the victim experiencing ventricular fibrillation. He was taken to the hospital and was pronounced dead. An investigation ensued, resulting in defendant being indicted on charges of murder in the second degree and manslaughter in the first degree. Following a jury trial, defendant was acquitted of the murder charge but convicted of manslaughter in the first degree. County Court thereafter sentenced defendant, as a second violent felony offender, to a term of 25 years in prison, to be followed by five years of postrelease supervision. Defendant appeals.
Defendant contends that the evidence produced at trial is not legally sufficient to support the charge of manslaughter in the first degree and that the verdict is against the weight of the evidence. "When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt. At the same time, when conducting a weight of the evidence review, we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Bridges, 220 AD3d 1107, 1108 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 1091 [2024]; see People v Morgan, 230 AD3d 864, 865 [3d Dept 2024], affd ___ NY3d ___, 2025 NY Slip Op 05740 [2025]). In a circumstantial evidence case such as this, this Court must satisfy itself that " 'the inference of guilt is the only one that can fairly and reasonably be [*2]drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence' " (People v Baque, 43 NY3d 26, 30 [2024], quoting People v Sanchez, 61 NY2d 1022, 1024 [1984]). As relevant here, a person is guilty of manslaughter in the first degree when he or she, "[w]ith intent to cause serious physical injury to another person, . . . causes the death of such person" (Penal Law § 125.20 [1]).
At trial, a school social worker testified that on February 1, 2019, the victim had revealed to her that a bruise on his face was the result of defendant striking him and that she had then reported this to the Johnson City police and Broome County Child Protective Services (hereinafter CPS). Responding to this report, a Johnson City police officer went to the apartment and interviewed the victim. He stated that he observed multiple bruises on the victim, but that the victim denied that they were caused by defendant. A CPS caseworker, who also interviewed the victim on the same date, confirmed that the victim had visible bruising on his face and neck, but that, while he appeared nervous, he did not disclose any abuse.
The victim's mother testified that she was in a romantic relationship with defendant and that he frequently stayed at her apartment with her children. The mother confirmed that on January 31, 2019, the victim told her that he was "in trouble" with defendant. She confirmed that both the Johnson City police and CPS had come to her apartment the following day and spoken to the victim and that she was afraid she would lose custody of her children. On February 1, 2019, defendant came to her apartment and defendant discussed various options they could pursue to prevent her from losing custody. The next morning, defendant came to her apartment and suggested that she take her daughter and leave the apartment to "run errands" as he wanted to talk to the victim. To this end, he gave her money and directed her to take his car. The mother and her daughter left, leaving defendant and the victim alone in the apartment for hours.[FN1] The mother testified that at approximately 1:39 p.m. she received a telephone call from defendant stating that she had "to get here, [the victim] is acting crazy." When the mother arrived at the apartment, she found the victim lying naked on the couch and he felt cool. She stated that, other than defendant, no one else was in the apartment, and when she tried to wake the victim, she could not. As she thought the victim was suffering from hypothermia, she told defendant to put him in the shower and turn hot water on him. As defendant was carrying the victim into the bathroom, she left the apartment to go to Walgreen's to purchase oxygen. Unsuccessful, she returned to the apartment and, contrary to defendant's instruction, called 911, even though defendant told her not to call anyone. At that point, both she and defendant began attempting to resuscitate the victim.
Defendant's other girlfriend [*3]testified that she received a call from defendant at approximately 2:00 p.m. on February 2, 2019, imploring her to come quickly to an apartment located on Burbank Avenue. When she arrived, she saw the victim lying on the floor in front of the bathroom. She asked defendant what had happened and he responded, "now's not the time." She stated that she began performing CPR on the victim, but he was unresponsive. She further testified that defendant would not allow her to call 911. After several minutes of performing CPR, she stopped and left the apartment surreptitiously as the victim's mother was returning.
A Johnson City Police Department patrol officer, a Johnson City firefighter/EMT and an advance life support technician all testified that when they arrived at the apartment at approximately 2:29 p.m. they found the victim naked on the floor, cold, unresponsive and they began taking turns trying to resuscitate the victim. The patrol officer also stated that defendant was not present when she arrived. A State Police officer testified that he responded to the apartment after the victim was taken to the hospital to assist with the documentation and collection of physical evidence, and described the scene, including finding saturated boy's clothing in the tub.
A forensic pathologist testified as to the results of the victim's autopsy which he had performed. He noted that the victim had numerous injuries. The victim had a bruise to his left eye region and cheek, a scrape on his right temple, an abrasion between his right ear and eye, an abrasion to the under surface of his jaw and a scrape in his right ear canal. He relayed that these injuries were recent but had some healing characteristics to them and, in his opinion, these were the injuries previously documented by the CPS worker. Additionally, he testified that he observed lacerations on the victim's lips and several scrapes, bruises and abrasions throughout the victim's upper body, as well as on his scalp and several fingers. The pathologist testified that these bruises were recent, were not in the healing process and most likely occurred within 24 hours of the victim's death. He opined that the victim died as a result of a homicide and that the cause of his death was the result of asphyxia — or lack of oxygen to his brain and heart — from either suffocation, smothering or drowning. The pathologist opined that the tears to the victim's lip appeared to be from him biting his lip and, when coupled with the number of areas of pressure or impact on the victim's head, it appears he was held up against something or into something or held underwater, which would explain the suffocation and the water in his lungs known as pulmonary edema. Based on the lack of swelling in the victim's brain — which would occur if the brain suffered an injury from lack of oxygen over a period of time — the pathologist determined that it was a matter of minutes between the insult/injury and when the victim ultimately passed [*4]away. The pathologist further ruled out suicide or other natural causes of his death.
The foregoing evidence, when viewed in the light most favorable to the People, is legally sufficient to support the conviction of manslaughter in the first degree. The proof showed that the victim had previously been physically abused by defendant, that defendant was alone with the victim, that the victim died quickly after asphyxia and that defendant was the only one with the victim when he called the mother and his other girlfriend seeking assistance in resuscitating the victim (see People v Morgan, 230 AD3d at 867; People v Bridges, 220 AD3d at 1111; People v Nelligan, 135 AD3d 1075, 1077 [3d Dept 2016], lv denied 27 NY3d 1072 [2016]). Viewing the evidence in a neutral light and according deference to the jury's assessment of credibility of the various witnesses, we are similarly satisfied that the verdict is not against the weight of the evidence as intent may be inferred from defendant's actions and the surrounding circumstances (see People v Morgan, 230 AD3d at 867; People v Babcock, 152 AD3d 962, 967 [3d Dept 2017], lv denied 30 NY3d 947 [2017]; People v Rogers, 94 AD3d 1246, 1249-1250 [3d Dept 2012], lv denied 19 NY3d 977 [2012]).
Defendant next asserts that County Court erred in refusing to submit to the jury the charge of criminally negligent homicide as a lesser included offense of manslaughter in the first degree. "A defendant is entitled to a lesser included offense charge upon request when (1) it is impossible to commit the greater crime without concomitantly committing the lesser offense by the same conduct and (2) there is a reasonable view of the evidence to support a finding that the defendant committed the lesser offense but not the greater" (People v Oates, 222 AD3d 1271, 1274 [3d Dept 2023] [internal quotation marks and citations omitted]; accord People v Akins, 240 AD3d 1003, 1006 [3d Dept 2025]). Inasmuch as the People do not dispute the first prong, the issue comes down to whether any reasonable view of the evidence would permit a jury to acquit on the greater charge but still convict on the lesser one. To that end, "[a] person is guilty of criminally negligent homicide when, with criminal negligence, he [or she] causes the death of another person" (Penal Law § 125.10). "A person acts with criminal negligence . . . when he [or she] fails to perceive a substantial and unjustifiable risk that such result will occur" (Penal Law § 15.05 [4]). At trial, the pathologist testified that the victim died from asphyxiation caused by suffocation, smothering or drowning. Based on the victim's physical injuries, the pathologist opined that the victim was actively held against something or that his face was held under water. Thus, even giving defendant the most favorable view of the record, there is no reasonable view of the evidence to logically support a finding that defendant acted with criminal negligence and did not intend to cause the victim serious [*5]physical injury (see People v Cuatlal, 152 AD3d 539, 539 [2d Dept 2017], lv denied 30 NY3d 948 [2017]).
Defendant next contends that County Court erred in allowing the school social worker to testify as to the victim's hearsay statements, including that defendant struck him and caused the bruise on his face. We disagree. "Hearsay is an out-of-court statement admitted for the truth of the matter asserted, and the hearsay rule generally prohibits the introduction of such statements at trial" (People v Agan, 207 AD3d 861, 868 [3d Dept 2022] [internal quotation marks and citations omitted], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]). "The Confrontation Clause of the Sixth Amendment prohibits the use of a testimonial hearsay statement against a defendant unless the defendant is provided with an opportunity to cross-examine the witness" (People v Hulbert, 93 AD3d 953, 953 [3d Dept 2012] [citation omitted]; see People v Wolz, 112 AD3d 1150, 1153 [3d Dept 2013], lv denied 23 NY3d 1026 [2014]).These statements were not offered for the truth of the matter asserted, but rather to provide background information regarding the report that triggered the police and CPS investigation into the alleged abuse of the victim by defendant the day before his death and how the allegations were disclosed (see People v Rose, 185 AD3d 1228, 1231 [3d Dept 2020], lv denied 35 NY3d 1115 [2020]; People v DeCarr, 130 AD3d 1365, 1366 [3d Dept 2015], lv denied 26 NY3d 1008 [2015]). Moreover, County Court gave proper limiting instructions to the jury regarding such proof (see People v Shackelton, 177 AD3d 1163, 1165 [3d Dept 2019], lv denied 34 NY3d 1162 [2020]; People v DeCarr, 130 AD3d at 1366). Additionally, the Confrontation Clause was not implicated here because the statements were not admitted for their truth (see People v Davis, 23 AD3d 833, 835 [3d Dept 2005], lv denied 6 NY3d 811 [2006]; People v Wisdom, 23 AD3d 759, 761 [3d Dept 2005], lv denied 6 NY3d 840 [2006]).
Defendant, in his pro se supplemental brief, argues that he received ineffective assistance of counsel for a myriad of reasons. "To establish a claim of ineffective assistance of counsel, a defendant is required to come forward with proof that the attorney failed to provide meaningful representation and that there was no strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Williams, 232 AD3d 1124, 1125 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 43 NY3d 1059 [2025]; see People v Sposito, 193 AD3d 1236, 1237 [3d Dept 2021], affd 37 NY3d 1149 [2022]). Following our review of the record, we conclude that defendant has failed to make that showing. With respect to defendant's contention that the counts in the indictment were duplicitous and multiplicitous, this contention is unpreserved (see People v Marcantonio, 238 AD3d 1262, 1265 [3d Dept 2025]). As to defendant's contention that the indictment was amended, it was not the indictment[*6], but rather the bill of particulars that was amended, and the People are free to do so (see CPL 200.95 [8]; People v Horton, 181 AD3d 986, 992 [3d Dept 2020], lv denied 35 NY3d 1045 [2020]). Turning to defendant's argument concerning peremptory challenges, the use of such challenges is a quintessentially tactical decision and defendant failed to show a lack of strategic explanation (see People v Hooper, 238 AD3d 1207, 1211 [3d Dept 2025]). To the extent that defendant argues defense counsel waived his Antommarchi rights, this is belied by the record. Before beginning jury selection, County Court explained to defendant his right to be present for sidebar conversations and that if defendant did not come forward to participate in the conference, the court was going to assume he elected not to participate. Thus, defendant's conduct served as an implicit waiver of his Antommarchi rights (see People v Henehan, 238 AD3d 1336, 1340 [3d Dept 2025], lv denied 43 NY3d 1055 [2025]). As to defendant's assertion that he was denied his right to be present at a pretrial hearing on June 23, 2020, this was not a pretrial hearing; instead, it was an appearance for oral argument on defendant's application for a judicial subpoena, and defendant's presence is not required where counsel is simply arguing a legal position to which the defendant has nothing of value to contribute (see People v Williams, 85 NY2d 945, 947 [1995]). Lastly, as to defendant's argument that trial counsel was ineffective for making a limited number of objections, defendant failed to establish that counsel's lack of raising objections was not a strategic attempt to avoid bringing added attention to or unintentionally emphasizing certain testimony (see People v Deas, 236 AD3d 1105, 1109 [3d Dept 2025], lv denied 43 NY3d 1007 [2025]). In viewing trial counsel's representation of defendant in total, we find that defendant was provided meaningful representation as trial counsel, among other things, delivered cogent opening and closing arguments, conducted meaningful cross-examination and zealously represented defendant (see People v Hooper, 238 AD3d at 1211; People v Deas, 236 AD3d at 1109). We have considered defendant's remaining contentions and find them to lack merit.
Garry, P.J., McShan, Powers and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: The mother's testimony regarding the various errands she undertook, and the businesses she went to, were corroborated by videos and receipts.